PETROLEUM RIGHTS CORPORATION, a corporation of the
State of Delaware,

*vs.*

MIDLAND ROYALTY CORPORATION, a corporation of the State of Delaware, J. EDWARD JONES, DICKSON Q. BROWN, RUDOLPH H. WEBER, T. W. D. DUKE, FRANK HASKELL, STANLEY L. JONES, J. G. SCATTERGOOD, HOWARD S. MCNAIR, HENRY E. WATKINS, I. MONTE-FIORE LEVY, EDMUND BAINBRIDGE AND CHARLES A. MURPHY.

*New Castle, June 26, 1933.*

*Aaron Finger,* of the firm of Richards, Layton & Finger, and *Charles F. Richards,* for petitioner.

*Hugh M. Morris* and *Edwin D. Steel, Jr.,* for defendants McNair, Watkins, Levy, Bainbridge and Murphy.

*Robert H. Richards, Jr.,* for other defendants.

THE CHANCELLOR: This rule raises the question of the right of the holders of the preference shares to elect four of the seven directors.

There are forty thousand shares of the corporation's preference stock and one hundred thousand shares of its common stock outstanding. The particular provision of the certificate of incorporation which is here material is as follows:

"The holders of Preference Stock shall have no right to vote such stock, either at elections of.directors, or in any other corporate proceedings or meetings, or to receive notice of such elections, proceedings or meetings, and they relinquish and waive absolutely the right to vote such stock—save only in so far as the statutes of the State of Delaware prohibit or prevent the relinquishment or waiver by such holders of the right to vote such stock and except as otherwise herein expressly provided, unless dividends for six (6) quarterly periods (whether consecutive or not) payable on the Preference Stock shall be unpaid, in which event the holders of the Preference Stock shall be entitled to notice of and to vote at all meetings of stockholders and to elect a majority only of the Board of Directors of the corporation, so long as the surplus of the corporation applicable to the payment of dividends shall be insufficient to pay all accrued dividends; the remaining members of the Board of Directors shall be elected by the holders of the Common Stock."

When the stockholders convened in annual meeting for the purpose of electing directors on March 2, 1933, dividends on the preference stock for six quarterly periods were unpaid. That being so, the holders of·a majority of the preference stock claimed that their right immediately arose to elect a majority, that is to say four, of the seven directors to be chosen, and proceeded to elect four directors notwithstanding the holders of the common stock had assumed to adjourn the meeting.

The solicitor representing the preference stockholders, contends that under the language of the certificate of incorporation the passing.of six quarterly dividends constitutes a condition precedent, the only condition precedent, for the arising of the elective right of the preference shares, the language being "in which event the holders of the preference stock shall be entitled, etc." Inasmuch, how-

ever, argues the solicitor representing the common stock, that the right of the preference stock to elect a majority of the board can exist only "so long as the surplus of the corporation applicable to the payment of dividends shall be insufficient to pay all accrued dividends," it must follow that if the surplus exceeds the unpaid dividends (as is contended is the case) the right to elect is immediately stricken down as soon as it arises. Therefore, it is argued in behalf of the common stockholders, the deficiency of surplus below unpaid dividends, though not grammatically phrased in the form of a condition precedent to the arising of the right, as is the provision regarding the six unpaid quarterly dividends, is nevertheless in substance and effect a condition precedent as much as is the provision regarding unpaid dividends. Against this view it is vigorously urged in behalf of the preference stock that the language of the charter contract in its manner of phrasing admits of no other interpretation with respect to the surplus provision than that it constitutes merely a condition subsequent which, when met, defeats the continuation of the right which sprang into existence as soon as the plainly expressed condition precedent vitalized it.

If the provision regarding surplus expresses merely a condition subsequent, then it must follow, it seems to me, that the sole purpose of the scheme devised for the election by the preference stock of a majority of the board upon the passing of six quarterly dividends, must be said to have been to put it in the power of the representatives on the board of the preference stock to force a payment of the passed dividends if a dividend fund is available. This is manifest from the fact that if the surplus does in fact exceed the six quarterly dividends in arrear and the preference stock should elect a majority of the board and the board should resolve not to pay the dividends, the right of the preference stock to continue to elect a majority of the board would undoubtedly terminate. Therefore it

would seem clear that if the provision with respect to the surplus expresses only a condition subsequent, the sole purpose of the scheme for shifting the control to the preference stock, when the financial condition of the corporation permits dividends to be paid, must be to give to the parties having a personal interest in the payment of dividends, viz., to the holders of the preference stock, the power to see themselves paid. That is to say in other words, the purpose of the scheme in this view would be to permit the preference shareholders, through directors chosen by them, to determine whether dividends have been unjustly withheld from themselves when a fund is available for their payment. Of course such a scheme is not absolutely essential for the protection of the preference stock against an unjust withholding of dividends, because recourse to the courts could be had for relief against an arbitrary and inequitable withholding of dividends in a proper case.

The language of the provision commencing "so long as, etc." very clearly discloses to my mind that there is meant to be an intimate association between the assumption of the right of election by the preference shareholders on the one hand and the deficiency of surplus below unpaid dividends on the other. That association would suggest that it was not intended for the preference shares to control the majority of the board unless there was a deficiency of surplus below unpaid dividends and therefore probably a need for new control. If so the shifting of control would be made to turn not alone on the consideration of the personal interests of the preference stockholders in dividends, but as well on the consideration that if surplus fell below unpaid dividends the time had arrived to try a new management.

The language of the provision is not free from difficulty. Reading it all together, however, I am of the opinion that it means that before the preference shares

are entitled to elect a majority of the board there must be a conjunction of two events, (a) the existence of six quarterly unpaid preference dividends, and (b) an insufficiency of surplus to pay them.

But even if that provision means that the two events must conjoin in order to give rise to the elective rights of the preference shares, it is contended on behalf of the holders of those shares that both the events have occurred. It is admitted that six quarterly dividends have been passed amounting to $120,000; and it is contended further that instead of there being a surplus of $230,753.40 as shown by the balance sheet there is in truth a deficit of over $300,000.

Upon the question of whether a surplus exists, the management has shown very little more than the balance sheets. It did produce a witness who testified that in his opinion the leases and royalties are worth more today than they were when they were bought. The company, however, carries them at the original cost basis. The question of whether there is really any surplus, was raised at the stockholders' meeting and the purported reason for the adjournment of the meeting was to enable a valuation of the properties to be made. It seems strange to me that none of the officers of the corporation could throw any light on the question of values at the stockholders' meeting. It is equally strange that they have produced such little testimony as an aid to the court in arriving at an intelligent conclusion upon this controverted question of fact. Practically all I have before me to support the surplus item of over $230,000 is its appearance on the balance sheet, together with the opinion above referred to— an opinion which stands opposed to one to the contrary expressed by a witness called by the preference shareholders.

Now, of course, figures on the balance sheet are not conclusive. They are attacked by the solicitor representing

McNair and his associates who were elected by the preference stockholders as directors. The attack is directed against the item of depletion. The balance sheets for 1929 and 1930 show a deduction for depletion during those years of $172,371.02. This deduction was taken on the balance sheets in accordance with the deduction for depletion claimed for Federal Income Tax purposes. The purely arbitrary formula allowed by the Internal Revenue Bureau for calculating depletion was adopted of twenty-seven and one-half per cent. of gross income. This formula is admitted in no sense to reflect the actual depletion. It appears, however, that the Internal Revenue authorities allow an alternative method of calculating depletion. This method, I understand to be, is to ascertain the per barrel cost of estimated oil in the ground and deduct the value of the actual number of barrels taken out during the year (cost per barrel times barrels taken out) from the total cost of the investment. This method undertakes to arrive at actual depletion.

Now the defendant corporation has filed a claim for refund of taxes for the years 1929 and 1930, seeking to have the government allow depletion on the basis of actual depletion rather than on the arbitrary basis upon which its taxes were assessed and paid. It has supported its claim by an engineer's report showing the exact number of barrels taken out during those years. That report shows that during 1929 and 1930 the corporation took out a quantity of oil which, if valued according to the estimated oil in place and the cost per barrel thereof, had a value of $758,172.04.

The corporation continued to carry its properties at the original cost price, less of course depletion. But the depletion deducted was not the actual depletion of $758,-172.04 as above calculated. It was only $172,371.02, the amount of depletion calculated according to the twenty-seven and one-half per cent. rule of thumb method before referred to. The difference between these figures is $585,-

801.02 and it is contended by the preference stockholders that the total assets should therefore be written down by this figure. If so, the claimed surplus of over $230,000 is wiped out and a deficit of over $300,000 is made to appear.

Now there may be some answer to this contention founded either in fact or in the principles of accounting applicable to oil companies, sufficient to overcome it. If there is, it has not been advanced before me. I accept the contention, then, and hold that on the showing thus far made, no surplus exists sufficient to cover the six quarterly unpaid dividends.

Therefore both events have occurred on which the right of the preference stockholders arose to elect four of the seven directors at the meeting of March 2, 1933.

One other question remains. It is contended by the solicitors for the complainant that the preference stockholders had no right to remain assembled for the purpose of electing four directors after the meeting had been adjourned. I cannot accept that contention. The purported adjournment was carried by the votes of the common stock over the opposition of the preference stock. I am unable to see how the common stock had any power whatever to compel the preference stockholders to postpone the business which it was their peculiar province to transact and concerning which the common stockholders were in no sense entitled to be heard.

A preliminary injunction will be denied.