G. Burton LIESE and Claude M. McDonald,
Plaintiffs,

v.

The JUPITER CORPORATION et al.,
Defendants (two cases).

Court of Chancery of Delaware.

New Castle.

Feb. 28, 1968.

Potter, Anderson & Corroon, by Richard F. Corroon, Wilmington, for plaintiffs, G. Burton Liese and Claude M. McDonald.

Baker, Botts, Shepherd & Coates, by John E. Bagalay, Jr., Alvin M. Owsley, Jr., and John Kirkland, Houston, Tex., of the Texas Bar, for plaintiff G. Burton Liese.

Young, Conaway, Stargatt & Taylor, by H. Albert Young, and Edward Maxwell, 2nd, Wilmington, and Friedman, Koven, Salzman, Koenicsberg, Specks & Homer, by Sheldon O. Collen, and Howard R. Koven, Chicago, Ill., of the Illinois Bar, and Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons, by William W. Brackett, Chicago, Ill., of the Illinois Bar, for individual defendants.

Connolly, Bove & Lodge, by Januar D. Bove, Jr., Wilmington, for defendant The Jupiter Corporation.

DUFFY, Chancellor:

These are actions consolidated for trial in which the real adversaries are the holders of preferred and common stock respectively. The objective is management control of The Jupiter Corporation, a Delaware corporation ("Jupiter"), and the decision as to this includes a construction of Jupiter's certificate of incorporation relating to voting rights of the preferred stock.

## I

### A. *The parties and the contentions:*

Jupiter is a diversified company with operating divisions in the fields of transportation, construction and real estate, among others. One of these is a gas gathering oil and gas division which derives its principal revenues from the servicing of off-shore wells in the Gulf of Mexico owned by Union Oil Company of California ("Union"), Kerr-McGee Oil Industries, Inc., and Phillips Petroleum Company ("Phillips"). Jupiter's common stock is listed and is held by approximately 12,000 common stockholders. The preferred stock is not listed; there are about 8,000 preferred stockholders.

Plaintiff G. Burton Liese owns some 111,000 preferred shares, which is about 20% of the outstanding preferred. At all pertinent times Mr. Liese has been and is a director and vice-president of Jupiter. Mr. McDonald is neither a director nor officer of the company.

The individual defendants are the "common stock directors" and principal officers of Jupiter who are now exercising management control of the corporation.[1]

Jupiter has not paid any dividend on the preferred stock since January 1, 1966. Under the charter, quarterly dividends on that stock are payable on the first days of January, April, July and October. At the time of trial, six preferred dividends had been "passed."

Plaintiffs contend that the preferred stockholders are entitled to elect a majority of the nine-member Jupiter board because (i) payments have been made on contractual indebtedness and accrued dividends on the preferred stock have not been paid; and (ii) accrued and unpaid dividends on the preferred are in arrears in an amount equivalent to three full quarter-yearly dividends.

Defendants contend that there has not been any gas gathering income for any period for which dividends have not been paid and, hence, no such dividends are accrued or unpaid. Defendants also raise certain other defenses which are considered hereafter.

### B. *The background*

In 1962 Jupiter acquired the business and assets of Commonwealth Oil Company, a Florida corporation ("Commonwealth"), under a merger in which the Commonwealth stockholders received a new issue of Jupiter preferred stock. All or substantially all of the preferred stock issued by Jupiter resulted from that merger.

The Jupiter charter carefully and completely relates the preferred stock to the gas gathering system in a way that suggests that Jupiter and Commonwealth wanted the benefits of merger without its unitizing impact. But while the seeds of division

[1.] Because the interest of the corporation might at any given time differ from that of either of the competing stockholder groups, the Court, on plaintiffs' motion, required that it be represented by separate counsel. Throughout this opinion "plaintiffs" refers to both plaintiffs in both cases, except when otherwise stated. I do this for convenience, recognizing that the status and contentions of Messrs. Liese and McDonald are not in all respects identical. And I use "Jupiter" to refer to all defendants, with exceptions as noted. I do this also for convenience and not to blur the distinction between the corporation and the individual defendants. I am aware, too, that the positions which counsel for the individual defendants have taken in these proceedings are not always nor in all respects those of Jupiter's counsel.

were planted in the charter, they did not germinate until 1966 when gas gathering revenues were reduced by some 65%.

In December 1962 the Federal Power Commission instituted an investigation of, among other things, the gas transportation rates charged by Jupiter for servicing the off-shore wells.

In January 1966 the Presiding Examiner filed his initial decision which was most unfavorable to Jupiter. The proceedings were eventually ended by an FPC order effective May 15, 1966 which was based upon an offer of settlement made by Jupiter. That order reduced corporate jurisdictional revenues to approximately $500,000 annually (from a $1,500,000 level) and required Jupiter to escrow $1,602,298 against a contingent liability for severance taxes imposed by the State of Louisiana and actually collected and held by Jupiter. At present revenue levels any and all net gas gathering income goes to the holders of preferred stock, while the holders of the common, in effect, pay the income taxes on it.

The annual meeting of the corporation was noticed by management for June 21, 1967. Without attempting to particularize all of the events of that day, I note that the common stockholders elected a board of nine directors, six of whom were "common" directors and three of whom were "preferred" directors. The holders of preferred stock, or certain of them, met and elected five "preferred" directors. Each side then elected a slate of officers and purported to act as management of the company. The chaotic consequence of all of this is referred to hereafter.

C. The actions

The first of the suits consolidated for trial, Civil Action 2565, was filed on Feb-

ruary 17, 1967 and is designated as a class suit brought on behalf of all preferred stockholders; it seeks a determination by the Court to the effect that under Jupiter's charter the preferred stockholders have, as a matter of law, the right to elect a minimum majority (5) of Jupiter's board, and an order for the call of a meeting for that purpose.

The second suit, Civil Action 2630, was filed on June 21, 1967 and is designated as a petition to review the election of directors. In that case plaintiffs seek a declaration by the Court that the five directors elected by preferred stockholders on June 21 were validly elected.

II

I first consider the petition to review the election of directors under 8 Del.C. § 225.[2] At this point I assume, without deciding, that there has been a default in the payment of one or more dividends on the preferred stock and, under the charter, the holders of preferred stock had the right to elect a minimum majority of Jupiter's board.

Plaintiffs contend that this was done on June 21 and since that date G. Burton Liese, R. G. Rice, John D. Kirkland, Harold Burrow and Alvin M. Owsley, Jr., have constituted a majority of the board.

The notice of the annual meeting sent by management provided that one of the purposes of the meeting was to elect directors for the ensuing year. At that meeting Mr. Kirkland, acting for and with Mr. Liese and other preferred stockholders, sought recognition from the Chair and attempted to move the nomination of five (preferred) directors to the nine-man board. He was ruled out of order. Mr. Kirkland and other preferred stockholders then "convened" an-

2. The pertinent part of 8 Del.C. § 225 reads:
 "Upon the application of any stockholder, * * * the Court of Chancery may hear and determine the validity of any election of any director, * * * of any corporation organized under this chapter and the right of any person to hold such office, and in case any such office is claimed by more than one person may determine the person entitled thereto; * * *."

other meeting of Jupiter stockholders in a different room in the same building, after first inviting all stockholders present to meet with them.

Mr. Liese was selected as chairman of that meeting. It was determined that a quorum of common stockholders was not present and thereafter common stockholders did not participate in those proceedings. About 60% of the outstanding preferred stock was represented in person or by proxy. And it was at that time and circumstance that Messrs. Liese, Rice, Kirkland, Burrow and Owsley were said to have been elected as directors of the corporation. Thereafter they met and elected corporate officers.[3]

At the same time all of the above was taking place the meeting of stockholders noticed and called by management as the annual meeting was continuing elsewhere; nine directors were elected, including three "preferred" directors.

## A. *The contentions*

█ Plaintiffs contend that the provisions in the charter which shift majority voting powers to the preferred became operative as a result of default in the payment of dividends, and that the notice of annual meeting sent by management was sufficient notice to all stockholders under the corporate charter. In short, plaintiffs say that all stockholders were notified that a meeting was to take place for the election of directors, that a majority of the preferred stockholders took the position that the preferred stockholders were entitled to elect five directors and did so.

## B. *The charter*

Section Fourth A 6(b) of the Jupiter charter provides as follows:

"* * * At any time when default voting rights shall, pursuant to the provisions of this Section 6(b) of Part A, be vested in Preferred Stock, the President, or any Vice President, or the Secretary or the Treasurer of the corporation shall, upon the written request of the holders of record of at least ten percent (10%) of the total number of shares of Preferred Stock outstanding, addressed to the Secretary of the corporation, call a special meeting of holders of Preferred Stock and of any other class or classes of stock having voting power with respect to the election of directors. Such meeting shall be held at the earliest practicable date at the place at which the last preceding annual meeting of stockholders of the corporation was held, but may be held at the time and place of the annual meeting if such annual meeting is to be held within 60 days after such additional voting rights shall be vested in Preferred Stock. If such meeting shall not be called by the proper officer of the corporation as required within 20 days after personal service of the said written request upon the Secretary of the corporation, or within 20 days after mailing the same within the United States of America by registered mail addressed to the Secretary of the corporation at its principal office (such mailing to be evidenced by the registry receipt issued by the postal authorities) then the holders of record of at least ten percent (10%) of the total number of shares of Preferred

3. The management selected by Messrs. Liese, Rice, Kirkland, Burrow and Owsley attempted to take over control of the corporate affairs. They sent notices of the change in management to the American Stock Exchange, to banks and other financial institutions with which Jupiter did business, and attempted to physically occupy the Jupitur executive offices. To bring some order to these utterly confused corporate affairs and to preserve the status quo of management as it was exercised prior to June 21, the Court, on Jupiter's motion, issued on June 23 an order which, *inter alia*, temporarily restrained the above-named persons from taking any further action to assume management control of Jupiter's affairs.

Stock then outstanding may designate in writing one of their number to call such meeting, and such meeting may be called by such person designated upon the notice required for annual meetings of stockholders and shall be held at the place at which the last preceding annual meeting of the stockholders of the corporation was held. Any holder of Preferred Stock so designated shall have access to the stock books of the corporation for the purpose of causing a meeting of stockholders to be called pursuant to these provisions.

At any meeting so called by the holders of Preferred Stock and at any other meeting of stockholders held for the purpose of electing directors at which the holders of Preferred Stock shall have the right, voting separately and as a class, to elect directors as provided in this Section 6(b) of Part A, the presence in person or by proxy of one-third of the outstanding shares of Preferred Stock shall be required to constitute a quorum of such class for the election of any director by the holders of Preferred Stock voting as a class."

## C. *The facts and the law*

It is undisputed that a special meeting of the holders of preferred stock was not called by a Jupiter officer; demand for such a meeting had been made by Mr. Liese but management refused to comply with it. Neither Mr. Liese nor any other preferred stockholder acted to call a special meeting of stockholders. Plaintiffs say that the election by their group took place as part of the annual meeting; in his brief Mr. Liese calls it a "continuation" of the annual meeting, while Mr. McDonald seems to say that it was merely a "separate class" vote. The minutes of the proceeding refer to themselves as "Minutes of the Annual Meeting of Stockholders."

 The charter of a corporation and its by-laws are the fundamental documents governing the conduct of corporate affairs.

These documents establish norms of procedure for exercising rights and all stockholders have a right to rely on them as to notice and other procedural requirements stated therein. Fairness and good order require that charter and by-law requirements be followed in selecting directors, officers and otherwise giving life to the corporate body.

Jupiter's by-laws require written notice of both annual and special meetings to *each* stockholder entitled to vote thereat. And the common has voting rights when the preferred has majority control of the board.

First, as to notice. In my judgment the notice which was sent by management was inadequate to give preferred (and common) stockholders reasonable notice under the circumstances. It is true that the notice was given for the purpose of electing "directors for the ensuing year." But the proxy statement which was physically attached to the notice, and upon which plaintiffs rely, states quite clearly that six of the directors are to be elected by the holders of common stock and only three are to be elected by holders of preferred stock.

The proxy statement goes on and describes the dispute over voting rights and states that the chairman of the meeting intends to rule Mr. Liese out of order in the event he attempts to nominate two additional preferred directors. But nothing in it reasonably gives notice of a separate meeting or convocation of preferred stockholders, whether as a class or otherwise. (The management form of proxy which accompanied the proxy statement stated that it might not be used for purposes of electing more than three preferred stockholders.) At most, the proxy statement forecasts a floor fight *at* the annual meeting and plaintiffs are not in a position to rely upon it as fair notice to *all* stockholders of the action which they in fact took on June 21. Those in the vanguard of these two competing stockholder groups have an interest in the result, but so does each other stockholder, and good order and fairness require that all

stockholders be given an opportunity to participate in a meaningful meeting. Compare Vogtman v. Merchants' Mortgage & Credit Co., 1935, 20 Del. Ch. 364, 178 A. 99, 104.

Second, as to what did take place, the dilemma forced upon non-alligned preferred stockholders is made apparent in the minutes of the meeting. To which "meeting" should a preferred stockholder have gone? Should he have remained where he was at the annual meeting called by management with the president of the corporation in the Chair? Or should he have accepted plaintiffs' invitation to meet elsewhere? Which was rump and which was regular?

The transcript of the meeting points up the problem. One stockholder (unidentified) said to Mr. Kirkland:

"My dear man, look. We want to know. We want to get to the guts of the situation, and if we leave here and we go to another meeting, we are going to miss out on not technicalities but the substance of the situation. And this we don't want to miss out on.

Now, I want to attend your meeting. I have known Burt Liese for many years in the old commonwealth days but I don't want to miss out on this. I don't want technicalities to deprive us of the substance. This is what we are interested in."

Mr. Kirkland's reply was enlightening:

"I understand, I agree. Both you gentlemen have a very valid point.

Let me point out, however, that Mr. Liese has more than 50 per cent of the preferred stock, and he is going to take the action which I have heretofore outlined. So the fact you may represent preferred stockholders and not want to vote the way he does wouldn't make any difference in our meeting."

And the dilemma was not limited to preferred stockholders, as witness the following statement made to Mr. Kirkland:

"A STOCKHOLDER: I am Alexander Rubin. I represent many thousand shares of preferred and of common. And I think that in deference to people who have holdings in both, and in deference —in fact in deference to everyone, you should defer the other meeting until we get through here. I am not interested in management either. But I want to know what they have to say."

A stockholder should not have to choose at his peril in such a situation.

Third, plaintiffs contend that preferred stockholders can exercise default voting rights at any annual meeting of stockholders. It is true that the charter provides that "Whenever, at any time or times [certain defaults in dividend payments have occurred] * * * the holders of outstanding Preferred Stock shall have * * * the exclusive right, voting separately and as a class, to elect [a minimum majority of directors] * * * at each meeting of the stockholders held for the purpose of electing directors * * *." But the short of it is that the meeting upon which plaintiffs rely was not such a meeting. It was, in fact, a separate assembly which they convened independent of and contemporaneous with the annual meeting.

I should note here that I am not called upon to decide the result had plaintiffs "continued" the annual meeting after management adjourned it, and then taken steps to exercise default voting rights. Compare Petroleum Rights Corporation v. Midland Royalty Corp., 1933, 19 Del.Ch. 334, 167 A. 835. Here the annual meeting was noticed for Room 135 Chemical Bank New York Trust Company. Apart from the question of notice, the meeting which plaintiffs convened was not held there and was not, in any sense, an adjournment or continuation of the annual meeting. It was simply, in Mr. Kirkland's word at the time, "our" meeting.

Plaintiffs rely on Gow v. Consolidated Coppermines Corporation, 1933, 19 Del.Ch. 172, 165 A. 136; but I do not regard that

case as pertinent here. The Court there initially considered what might be done under a general, unrestricted proxy and the conduct of inspectors of election who exceeded their authority. And it applied the principle that when a stockholders meeting breaks into two parts it is reasonable to regard the two as one for the purpose of determining the result of a vote, if that can be done without jeopardizing the accuracy of the result. Apart from the question of notice to other stockholders, I am unable to understand how it would be reasonable to regard these two "meetings" as one: How, for example, would the common stock directors be designated? Six were elected and, if plaintiffs are correct, there are only four offices for them. Any combination of the "meetings" would, at minimum, jeopardize the accuracy of the result.

Finally, Jupiter's charter provides a procedure to be followed when the meeting requested by preferred stockholders is not called. The holders of record of at least 10% of Jupiter's outstanding preferred stock may effectively arrange for the call of a special meeting and the procedure for so doing is carefully stated. When management here refused to call the meeting, the preferred stockholders, under my original assumption, could have exercised the charter right to call a special meeting; but they did not do so.

The meeting which the plaintiffs argue they were entitled to have was never called by management, it was never called by plaintiffs, and the notice of the annual meeting was not adequate to permit plaintiffs to adjourn that meeting to another place, or to simultaneously convene elsewhere for the purpose of exercising default voting rights. In my judgment plaintiffs' actions were entirely ineffective.

Jupiter's *motion to dismiss* Civil Action 2630 will be granted.

### III

I turn now to Civil Action 2565, in which an important issue is whether or not there are accumulated and unpaid dividends on the preferred stock; this in turn depends upon whether Jupiter had gas gathering income during the periods in question.

#### A. *The gas gathering system*

Jupiter owns two parallel pipelines which transport gas from platforms about 10 miles out in the Gulf of Mexico to a point on the Louisiana shore connecting with lines of the Tennessee Gas Transmission Co. ("Tenneco"). The gas originates with two producers: (i) Union (formerly Pure Oil Co.) and (ii) Kerr-McGee Oil Industries and Phillips Petroleum Co. ("K–M–P"), operating jointly.

Two separate and distinct contractual relationships are involved. First, Jupiter has a contract with Union to *transport* the product of its wells to Tenneco, the purchaser, at an average rate of 3.4¢ per Mcf. Second, Jupiter *purchases* gas at the platform of the other producer, K–M–P, brings it to shore, separates it and re-sells it to Tenneco at a 2.4¢ margin. The gas is brought to shore in Jupiter's separate lines, but once there it is comingled in the same line which is owned by Tenneco. It is carried in that line some 29 miles to a Jupiter plant, where it is processed and, from there, it is carried about 8 more miles, still in a Tenneco line, to a plant operated by Phillips in which hydrocarbons are extracted from the gas.

Thus, physically the gas, whether purchased by Jupiter or merely transported for the account of Union, is treated alike and travels the same route. For present purposes the parties are agreed that there is no significant distinction between the two contractual arrangements.

#### B. *The charter*

The pertinent charter provisions are as follows:

"Fourth. A:

3. The holders of Preferred Stock shall be entitled to receive, when and as declared by the Board of Directors, out of any funds legally available therefor,

cumulative preferential dividends in cash, at the rate of $1.50 per share per annum and no more, payable quarter-yearly on the first day of January, April, July and October in each year * * *; provided, however, that the dividend payable on each share of the Preferred Stock with respect to any quarter-yearly dividend period shall not exceed the quotient determined by dividing (i) the gas gathering income of the corporation for the three calendar months immediately preceding the inception of such quarter-yearly dividend period (i. e., the first three calendar months of the six calendar months terminating on the quarter-yearly dividend payment date) by (ii) the number of shares of Preferred Stock outstanding on the record date taken for the purpose of determining the holders of Preferred Stock entitled to receive payment of such dividend * * *. In the event that the aggregate dividend paid to the holders of the Preferred Stock with respect to a quarter-yearly dividend period equals or exceeds the product of $.375 times the number of shares of Preferred Stock outstanding on such record date or the gas gathering income of the corporation for the three calendar months immediately preceding the inception of such quarter-yearly dividend period, which ever is the lesser, then such dividend payment shall satisfy the preferential dividend rights of the holders of the Preferred Stock for such quarter-yearly dividend period in full, and no amount of accrued and unpaid dividends shall accumulate or be payable thereafter with respect to such quarter-yearly dividend period. * * *

The term 'accrued and unpaid dividends' as used in this Article IV with respect to any share of Preferred Stock shall mean dividends on such share of Preferred Stock at the rate specified in this Section 3 of Part A from the date from which dividends accrued to the date as of which accrued and unpaid dividends are being determined, less the aggregate amount of all dividends theretofore declared and paid or set apart for payment upon such share of Preferred Stock; provided, however, that the amount of accrued and unpaid dividends on the Preferred Stock for a quarter-yearly dividend period shall not exceed the lesser of (i) $.375 or (ii) the gas gathering income per share of Preferred Stock outstanding on the record date taken for such quarter-yearly dividend period.

\* \* \* \* \* \*

(f) The term 'gas gathering income' for a particular period shall mean the total revenues accruing to the corporation from the operation of the gas gathering assets less all operating and nonoperating expenses properly allocable to the operation of the gas gathering assets, including expenditures for improvements, extensions, repairs (whether capital or ordinary) and maintenance necessary or advisable to maintain the operating efficiency of said assets (provided, that if any such expenditures are, in accordance with sound accounting practice considered to be a capital expenditure and such capital expenditures exceed in the aggregate the sum of $25,000 in any quarter-yearly dividend period, then such expenditures shall be amortized over the useful life of the capital improvement or over the period between the time such expenditure is made and December 31, 1981 whichever is the lesser period and deduction from total revenues resulting from such expenditures shall not exceed in any quarter-yearly dividend period the amount of depreciatin or amortization accruing thereon during such period) and accruals for taxes (other than income and excess profits taxes or other taxes which are imposed on income after the deduction of interest charges), but excluding all appropriations for depreciation, depletion, amortization or property retirement and all interest charges. Gas gathering income shall be determined in accordance with sound accounting practices; provided, however, that for purposes of such determination, the amount of general and administrative

expenses allocated to the operation of the gas gathering assets shall not exceed the sum of $41,250 for any quarter-yearly dividend period."

## C. *The accounting standards*

As to accounting aspects of the case, experts in the field testified for both sides and a substantial part of the evidence was directed toward the various facets of generally-accepted accounting principles. But I regard such testimony in the main as valuable for general purposes only. I say this because this case must be determined within its own frame of reference, and this is polarized around the special definition of gas gathering income which appears in the charter. That states, "Gas gathering income shall be determined in accordance with sound accounting practices; * * *."

A sound accounting practice is that which is fair, reasonable, appropriate. All of the experts agreed to that definition, and I apply it here. And I do so because the matters to which it is relevant are entirely intra-corporate, that is, matters which affect the rights and duties of the common and preferred stockholders respectively. Legally speaking, at least, third persons outside the corporate family are not affected by the result and hence have no interest in it.

I now turn to six different items which are significant in determining gas gathering income and to which much evidence, testimonial and documentary, was directed.

## D. *Absorption plant contract*

■ I first consider whether certain revenues received by Jupiter from the Phillips hydrocarbon extraction contract should be included in gas gathering income.

Gas brought to shore in Jupiter's lines is carried thereafter in Tenneco lines to the plant in which Jupiter separates liquid oil droplets (called condensates). After testing and measuring, the gas is turned over to Tenneco and title passes. The gas thus sold to Tenneco is then carried to the Phillips plant, where a true processing takes place. This means that some of the hydro-carbons (propane) are removed from the gas stream and sold as liquids.

Jupiter, under its contract with K–M–P, receives 30% of the moneys which Phillips receives from the sale of the liquids taken from the gas. This percentage amounts to about $82,000 a year. There is a dispute between the parties as to whether or not these moneys should be included in gas gathering income. Plaintiffs say they should be.

### (1)

Section Fourth A 12(f) of the charter defines "gas gathering income" as "the total revenues accruing to the corporation from the operation of gas gathering assets * * *." "Gas gathering assets" is described in subsection 12(e) as:

"* * * all of the corporation's gas gathering system and pipe lines, all of the corporation's gas separating and dehydrating plants, and all appurtenant and related facilities, equipment and property as of the date of this amendment situated in and offshore from the Parishes of Vermilion and Cameron, State of Louisiana, and serving the Rollover Field offshore from said Parishes, together with all improvements and extensions thereof, whether now owned or hereafter acquired to the extent that such improvements or extensions serve the Rollover Field and permit or facilitate the depletion of the natural gas and liquid hydro-carbon reserves of such Field, all being more particularly described as follows: * * *."

Thereafter, specific property and facilities are described and then seven specific contracts are described as gas gathering assets. The absorption plant contract is not listed, but both the original gas purchase agreement with K–M–P and the resale agreement with Tenneco are in the charter. The latter contract excluded the liquid hydrocarbons from the resale of gas by Jupiter to Tenneco.

Jupiter argues that (i) the K–M–P agreement is not specifically listed in the charter and it is therefore impliedly excluded under the doctrine of *expressio unius est exclusio alterius;* (ii) the plant is owned by Phillips and not by Jupiter; and (iii) economic benefits received in exchange for rights accruing under the contract does not make the absorption agreement a gas gathering asset.

### (2)

Whether or not the absorption agreement was executed before the merger is immaterial here, for the *exclusio* doctrine does not apply under this charter. The list of contracts is only one of eight provisions describing gas gathering assets. Thus, the charter itself provides alternative ways of finding a gas gathering asset. In addition, the *exclusio* rule is irrelevant because the absorption plant revenues came from a contract which *is* listed as one of the eight in the charter.

### (3)

The absorption plant is not owned by Jupiter but it does not necessarily follow that receipts derived from its operation are not gas gathering revenue. I say this because Jupiter's purchase contract with K–M–P is listed as a gas gathering asset. Part of the gas so purchased, the liquid hydrocarbons, is excluded from the resale to Tenneco (which is made under a listed contract) and resold to Phillips. The absorption revenues are derived in fact and in law from the hydrocarbons which are purchased in the contract with K–M–P. Thus, I find that the absorption plant revenue is derived from a gas gathering asset, the K–M–P contract, and as such is gas gathering income.

As I have previously noted, both sides agree that Jupiter's performance under the K–M–P contract and the Union contract is precisely the same: the corporation is a gas gatherer and transporter, and as such provides a service for which it is paid. The price difference between purchase and resale in the K–M–P case is essentially the same as the service charge to Union for carrying the gas. It seems reasonable to say that all Jupiter gains from the transaction should be equal to the service charge, or gas gathering income. Thus, in the overall K–M–P operation, Jupiter's payment for service consists of its profit on resale of "part" of the gas to Tenneco and its profit on resale of the remainder to Phillips. And the prices involved appear to support this result. Jupiter's average service charge to the producer, Union (which is passed on to the purchaser, Tenneco) amounts to 3.4¢ per Mcf., while its markup on resale to Tenneco of the K–M–P gas is only 2.4¢. Thus, revenues received from the hydrocarbon extraction bring Jupiter's total receipts close to that which it receives for the service to Union. Revenues from the absorption plant operation are an economic benefit which Jupiter derives from the purchase under a listed contract and hence the moneys become payable as a result of or under or in pursuance of that contract.

I therefore find that the absorption revenue is derived from a gas gathering asset, the Kerr-McGee-Phillips contract, and as such is gas gathering income. In the view I have taken, it is not necessary to consider other arguments of the parties on this issue.

### E. *General and administrative expense*

■ I next consider the allocation of general and administrative expense. The charter provides:

> "Gas gathering income shall be determined in accordance with sound accounting practices; provided, however, that for purposes of such determination, the amount of general and administrative expenses allocated to the operation of the gas gathering assets shall not exceed the sum of $41,250 for any quarter-yearly dividend period."

Jupiter arrived at allocation factors which can best be shown by the formulation used, rather than by any descriptive write-up which I might attempt.

## THE JUPITER CORPORATION
### DETERMINATION OF ALLOCATION FACTORS FOR GENERAL AND ADMINISTRATIVE EXPENSE*

| | | | | | | Allocation Factor | |
|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Line | Particulars | January 1, 1963 | December 31, 1965 | | Average | Total Company to Oil & Gas Division | Oil & Gas Division to Gas Gathering Operations |
| 1. | Average unadjusted gross plant: | | | | | | |
| 2. | | | | | | | |
| 3. | Total company gross plant (per annual reports). | 25,346,388 | 56,219,238 | | 40,782,813 | | |
| 4. | Oil and Gas Division Gross Plant** | 6,579,824 | 6,179,488 | | 6,379,656 | 15.65% | |
| 5. | Gas Gathering Gross Plant (included in Line 4) | 2,384,103 | 2,383,695 | | 2,383,899 | | 37.37% |
| 6. | Average gross revenues (before netting gas purchases) | | | | | | |
| 7. | | 1963 | 1964 | 1965 | Average | | |
| 8. | Total company revenues, (per annual reports) | 36,065,090 | 73,511,373 | 83,400,322 | 64,325,595 | | |
| 9. | Oil and Gas Division revenues | 6,034,336 | 5,978,823 | 6,036,875 | 6,016,678 | 9.35% | |
| 10. | Gas Gathering revenues (included in line 9)*** | 5,545,531 | 5,467,484 | 5,529,310 | 5,514,108 | | 91.65% |
| 11. | Total allocation factors | | | | | 25.00% | 129.02% |
| 12. | Average allocation factors | | | | | 12.50% | 64.51% |

13. Footnotes

14. * Prepared on a three-year average (1963–1965) in accordance with the method used before the Federal Power Commission by The Jupiter Corporation.

15. ** Excludes undeveloped properties, shut-in-wells and barge, which were non-operating and non-income producing properties, in accordance with generally acepted Federal Power Commission accounting principles.

16. *** Revenues included in annual report from Union Oil and Phillips-Kerr-McGee/Tenneco Contracts.

Plaintiffs argue against this formulation for several reasons:[4] (i) an appraisal value is used which unfairly increases expense; (ii) net rather than gross figures should have been used; and (iii) the years used as a basis for allocation are not the years actually involved in the controversy.

### (1)

An appraisal value was included in determining gas gathering gross plant and this is opposed, apparently only on the grounds that it would increase expense. I do not regard this as a controlling consideration in determining a sound accounting practice. The short of it is that I find that use of the appraisal item, considered in relationship to the entire formulation, to be a sound accounting practice.

### (2)

Plaintiffs next attack the use of gross rather than net figures for plant and revenue. It is said that the use of gross revenues is unrealistic because of the different nature of Jupiter's two "gathering" contracts: it purchases for resale under one and receives a fee under the other.

Although I find merit in plaintiffs' point that the use of a gross figure distorts the value of the resale contract, I find that, overall, the use of gross figures is a sound accounting practice. I say this because all Jupiter divisions have been included at gross figures. The use of net figures under one contract of one division would obviously lead to a distorted result. And if net figures were to be used throughout, the practical problems in the treatment of depreciation, deferrals and the like would be endless. The use of gross figures is fair and reasonable in a comparison with all Jupiter divisions and, for the purpose of de-

termining gas gathering income for dividends, I find those figures more appropriate.

### (3)

Plaintiffs argue that the years for determining the allocation factors should be those actually involved in the controversy. The fairness of Jupiter's use of 1963–65 is attacked as not reflecting the reduced rates ordered by the FPC as of May 1966. Plaintiffs also point out the great decrease of allocation for the oil and gas division from 1963 to 1965.

In opposition, Jupiter contends that the year average used is a sound accounting practice if a moving average period is used, i. e., as each year passes, the earliest year is dropped and the next later year added to keep it current.

I find the determination argued by Jupiter to be a sound accounting practice and that general and administrative expenses should be formulated with the "moving average period."

The fact that one method may give a lower allocation figure is, in itself, irrelevant, and the fact that the later figures were available at the time of trial is not relevant to a determination of what is fair, reasonable and appropriate. In routine computations a "present year" figure is not available to compute a divident for a period within that year. Thus, plaintiffs' proposal is inappropriate.

### F. *Phillips settlement*

After entry of the FPC order directing Jupiter to fund an escrow account in reference to its severance tax collections, Phillips began an action to recover certain amounts which it had paid Jupiter as such

---

4. In addition to the three points considered above, plaintiffs also argued: (a) the expenses involved a double charge for "Home Office Management Fees" and (b) the issue of time records or salaries in the computation would provide a better formula. As to the former, I conclude that there is no duplication (a point which plaintiffs did not argue in their reply briefs), and as to the latter, plaintiff's expert conceded that the use of plant and revenues may be used in some manner in making the allocation.

taxes. A settlement was negotiated in which it was agreed that Jupiter would pay $34,557 and Phillips agreed not to seek judicial review of the FPC order setting Jupiter's rate for transportation of gas. Payment was made in the fourth quarter of 1966 and Jupiter argues that it is entitled to deduct the $34,557 from gas gathering income for that period.

Plaintiffs point out that the severance tax here involved was paid by Phillips as part of payments made under the hydrocarbon extraction contract; plaintiffs argue that Jupiter cannot have it both ways by excluding revenue under that contract from income, and, at the same time, charging this payment against it. Plaintiffs also argue that it is a sound accounting practice to charge this payment against income for prior years when the disputed amounts were collected and taken into income by the corporation.

I have held already that revenues from the hydrocarbon extraction contract are gas gathering income and since this expense is in effect a refund of a part of those revenues, fairness and consistency require that it be charged to gas gathering income. As to a charge against prior periods, I conclude that it would not be a sound accounting practice to charge a gas gathering expense to prior quarters where dividends have already been paid. Payment was made in the fourth quarter of 1966 and the $34,557 should be deducted from gas gathering income for that period.

G. *Rate case expense*

██ I turn now to the issue of rate case expense.

On January 5, 1966 the FPC Examiner issued his decision as to, *inter alia*, the rates to be charged by Jupiter for transporting and selling gas. The investigation terminated when the Commission issued its order establishing new rates effective from May 15, 1966.

As a result of these proceedings, Jupiter incurred expenses of approximately $438,000. These were routinely paid as they were incurred and were charged against gas gathering income at that time.

Jupiter contends that, for present purposes, this rate case expense should be charged to gas gathering income on a deferral basis over a period of sixteen quarters, beginning with the effective date of the new rates. It argues that such expense is properly chargeable to gas gathering income under the corporate charter and that the rationale for deferral treatment is supported by practices in industry and in rate proceedings before the Commission. It says that this is a sound accounting practice because it charges expenses against revenues for the period in which the revenues are received. In short, Jupiter says that the expenses were incurred in connection with a rate to be fixed by the Commission and the rate so fixed became effective May 15, 1966.

(1)

The practices in industry and in rate proceedings with respect to the treatment of rate case expenses are relevant but are by no means controlling here. This is because the guiding principle fixed by the corporate charter is that of fairness and equity between the two competing stockholder groups, and that necessarily introduces criteria which may not be significant in industrial or rate proceeding practices.

As to plaintiffs' contention that the charter does not authorize a separate charge against gas gathering income for rate case expense, it is not supported by my reading. I say this because the list itemized in Fourth A 12(f) (improvements, extensions, repairs, etc.) is not all inclusive. The pertinent language is "total revenues * * * less *all* operating and non-operating expenses properly allocable to the operation of the gas gathering assets, *including* expenditures for improvements, * * * [Emphasis added.]"

Specifically, I am persuaded by the testimony of the experts to the effect that

rate case expense is properly and fairly chargeable to gas gathering income because such expenses were directly incurred in connection with the gas gathering system, and because those expenses are in no way connected with any other part of Jupiter's business.

Thus, to this point, I conclude that the rate case expenses are "properly allocable" to gas gathering income, and I turn now to the question of when those expenses should be charged.

### (2)

I conclude that the rate case expense should not be treated on a deferral basis, as Jupiter argues. It seems to me that it would be highly artificial to now "defer" these costs. I can understand how for purposes of establishing a cost of service or otherwise fixing rates deferral is both realistic and necessary to fairly relate the total cost of providing a service to the rate to be charged. But, as I emphasize throughout this opinion, we are concerned with what is fair, reasonable and appropriate between competing stockholder groups and not with the establishment of reasonable rates. In fact, the expenses were paid some time ago and to now resurrect and spread them out arbitrarily or artificially over a period of four future years would not produce a fair or reasonable result to the stockholders. I say this for several reasons:

First, the expenses were incurred to *defend* Jupiter's prior rates as well as to establish any post-hearing rate that the Commission might fix. Indeed, realistically, the expenses were probably incurred more in defense of the existing rates of which *both* stockholder groups were beneficiaries. That the FPC could not make any rate order retroactive is entirely beside the point. Jupiter was defending the level of payments and that is what is significant.

Second, treating them as past expenses is consistent with the way in which they were actually handled on the corporate books and in the financial statements.

Third, the expenses were paid during a period of high income from the gas gathering system and deferral would charge them during the period of low income and would do so entirely to the preferred stockholders. That would be an unfair and unreasonable result.

Rate case expense will not be charged to gas gathering income during the disputed periods.

### H. *Union overage*

■ The FPC ordered Jupiter, effective May 15, 1966, to reduce the Mcf. rate charged to Union from 3.4¢ to 1¢. Union continued to pay Jupiter at the 3.4¢ rate for several months, although Jupiter invoiced at the 1¢ rate. Meanwhile, Union unsuccessfully attempted to pass on to Tenneco (its customer) the full rate which it was paying to Jupiter. After Union threatened suit, Tenneco petitioned the Commission asking that Jupiter be ordered to bill Union at the 1¢ rate. That proceeding is pending.

Eventually Union refused to pay any sums to Jupiter, even the 1¢ rate, and specifically has not paid Jupiter for the months of April through August 1967 (and perhaps thereafter).

Jupiter has filed suit against Union in the United States District Court for the Northern District of Illinois to establish a right to the 3.4¢ rate. That case, too, is pending. If Jupiter is unsuccessful, Union may have a right to recover what is described in the evidence here as the "Union overage" amounting to $684,437 for the six quarters involved in this case. Should that sum be included in gas gathering income?

Plaintiffs argue that it should be included because Jupiter treated the money as income in its 1966 annual report and in its financial statement for the first quarter of 1967. Jupiter, on the other hand, argues that

plaintiffs ignore the real possibility that Jupiter may have to refund moneys to Union and inclusion of any of them in gas gathering income would not, under these circumstances, constitute a sound accounting practice.

Both sides agree that the standards stated in the charter control the meaning of gas gathering income. Since this term was specially defined for the purpose of indicating the availability of funds for preferred dividends, financial statement treatment of them is not controlling. The overage is, of course, not specifically covered in the charter, so reference again must be made to the "sound practices" provision.

■ Adherence to financial statement treatment of the overcharge would produce a result which would be neither fair, reasonable nor appropriate. I say this because all expert testimony, probably without exception, agreed on the proposition that receipts should be firmly established as income before they are utilized for the payment of dividends. I adopt that principle. Indeed, I cannot realistically conceive of any other approach to the treatment of this overage. How, in fairness, could Jupiter be required to include these moneys in gas gathering income when there is a serious question as to whether or not the corporation is entitled to keep them? If these are included, and if dividends are determined to be payable, would not plaintiffs have a right to payment? And, by definition, this would be from moneys which Jupiter may later have to repay to Union. Although Mr. Liese argues in his brief th..t this overage should be included in the computation of gas gathering income, he dealt with it more realistically during his testimony when he stated that he did not feel that it should be. Nor do I.

I therefore conclude that the Union overage is not to be included in the computation of gas gathering income.

I. *The severance tax escrow*

■ I next consider obligations arising from the collection of severance taxes.

The State of Louisiana imposed a tax on the "gathering" of natural gas. Commonwealth collected such a tax from its customers. The tax was declared unconstitutional. Louisiana then enacted a "severance" tax. Like the gathering tax, it was imposed on the producer. Commonwealth collected that tax. After the merger, Jupiter collected the tax. Neither Jupiter nor Commonwealth paid the tax to anyone.[5] Both companies paid Federal income taxes on the moneys so received and, apparently on the advice of counsel, used them for various corporate purposes, including the payment of dividends.

The agreement of merger between Jupiter and Commonwealth, dated November 17, 1961, states:

"2. Commonwealth represents and warrants that:

\* \* \* \* \* \*

(e) Commonwealth has established a reserve against any contingent liability arising out of severance taxes which may be claimed by the State of Louisiana in connection with the operation of its gas-gathering system in the sum of $516,374, which reserve in such sum is adequate to insure payment of such severance taxes in the event of the establishment of any liability therefor; \* \* \*."

The FPC Examiner's decision found, among other things, that Jupiter should (i) stop collecting the severance tax and (ii) escrow amounts collected as taxes by Com-

---

5. The decision by the FPC's Examiner states:
"Of all the remarkable aspects of this case, none is more amazing than the disposition of about $2 or $3 million of an extra charge by Jupi-

ter against its customer, Tennessee (and thus upon *their* customers down the line), for the State of Louisiana gas severance tax, but never paid over to the producers or to Louisiana or to anyone else."

monwealth and Jupiter since 1958. These provisions were eventually included in the order which became effective as of May 15, 1966, when gas gathering revenues were reduced from a $1,500,000 annual level to about $500,000 and Jupiter was required to escrow $1,602,298 in order to provide for reimbursement of the severance taxes. The latter amount was to be funded by $252,298 payable immediately and supplemented at the rate of $27,000 per month thereafter.

The impact of all of this on Jupiter, particularly in the relationship between the holders of preferred and common stock, was disastrous. Beginning in January 1966 serious efforts were made to reach an accommodation satisfactory to the holders of each class of stock. One plan proposed a spin-off of the gas gathering system. All efforts were unsuccessful.

After the FPC order, Jupiter restated its consolidated financial statements for 1965 and prior years to reflect the adjustment of severance tax revenues. Among other adjustments, the $516,374 reserve was taken into income as of January 1, 1966. At the same time, a reserve of $900,000 was put on the books to reflect the obligation to escrow.

### (1)

Severance tax liability, like the other five issues as to gas gathering income, must be viewed in light of Jupiter's general situation. Maximum preferred dividends were paid up to January 1, 1966. And the system generated enough to provide about $1,000,000 in general revenues (over the dividend) which benefitted the common stockholders. It was not until January 1966 that the two sides developed their respective theories of what is and what is not gas gathering income and of the accounting treatment of the various items before the Court. Now, Jupiter wants to fund the required escrow account as quickly as possible and place the entire burden on the preferred by reducing gas gathering

income to zero in each quarter beginning with the last quarter of 1965; at the same time it denies the preferred any credit for the $516,374 reserve. Plaintiffs, on the other hand, argue that the liability is not a charge to gas gathering income and that the entire amount should be charged to general revenues beginning with the last quarter of 1965 and carried back to prior years when the tax was collected.

### (2)

Plaintiffs say that the severance tax liability is not a deduction from gas gathering income because it is not delineated in the charter as a type of charge permitted to be made against gas gathering revenues. Jupiter says that the charter calls for such a deduction because these revenues were derived from a contract specifically listed as a gas gathering asset and are therefore a loss of gas gathering income when repaid.

Allowable charges are described in Section Fourth A 12(f) as follows:

> "* * * less all operating and non-operating expenses properly allocable to the operation of the gas gathering assets, including expenditures for improvements, extensions, repairs (whether capital or ordinary) and maintenance necessary or advisable to maintain the operating efficiency of said assets * * * and accruals for taxes (other than income and excess profits taxes or other taxes which are imposed on income after the deduction of interest charges), but excluding all appropriations for depreciation, depletion, amortization or property retirement and all interest charges. Gas gathering income shall be determined in accordance with sound accounting practices; * * *."

Plaintiffs contend that the escrow fund obligation is neither an accrual for taxes nor a non-operating expense. They say that the certificate defines a non-operating expense as "expenditures for improvements, extensions, repairs * * * and maintenance necessary or advisable to maintain

the operating efficiency of said assets," and that an escrow fund obligation does not fit any of these categories.

But the certificate description is prefaced by the word "including," which makes obvious to me that the expenses listed are not all-inclusive. If they were, such items as salaries, rents, supplies, raw materials and similar essentials might be excluded. Thus, I conclude that the charter listings are not the only non-operating expenses chargeable to gas gathering income. In addition, the taxes were collected by Jupiter under a contract specifically listed in the charter as a gas gathering asset and hence the revenue was gas gathering income when collected. Since the refund is related entirely to the gas gathering operation, I conclude that under the charter the severance tax liability is a non-operating expense properly allocable to the gas gathering assets and therefore is a deduction from gas gathering revenues.

(3)

I have decided that it would not be proper under the charter to charge general corporate revenues with the severance tax liability, and the next issue is the period in which the liability should be charged to gas gathering income. Plaintiffs apparently contend that it should be charged against revenues in the years in which the tax was collected. Jupiter proposes to deduct the severance tax expense from gas gathering revenues, beginning with the fourth quarter of 1965 and going forward, contending that the liability should be amortized from the time when it became known that Jupiter would have to refund.

I conclude that a charge to prior years is neither fair, reasonable nor appropriate in light of the situation in which the corporation found itself. A charge to those years would not really be against gas gathering income because dividends have been paid from that income and the remainder was in fact taken into general income. And the liability did not accrue prior to

the Examiner's decision. I think it should be spread into future periods when it is paid.

The liability really accrued or became reasonably certain with the Examiner's decision of January 5, 1966, which found that Jupiter should stop collecting the tax and recommended the establishment of the escrow account. It was at this point that it first became necessary to compute gas gathering income.

(4)

By far the most difficult issue involved in the severance tax part of the case is that of determining a method for deduction of the liability in computing gas gathering income for deduction. Under the charter this is to be done according to sound accounting practice.

Jupiter has selected what seems to me to be a unique approach. It would deduct an amount of severance tax in each quarter which is equal to the gas gathering income in that quarter, thus reducing gas gathering income to zero in each quarter until the full liability of $1,602,298 has been provided for. It argues that such a method is a sound accounting practice because it shares the expense between the common and preferred stockholders, losses are written off as quickly as possible, and it is the method followed in accounting for similar refund liabilities incurred by oil and gas ventures. Hence, says Jupiter, it is a sound accounting practice.

Jupiter's proposed method is neither fair, reasonable nor appropriate. Jupiter argues that its proposal shares the expense between common and preferred because the preferred only bear the burden to the extent of the maximum dividend, while the rest of the income belongs to the common and thus they bear the loss to that extent. This is entirely fanciful. At present income levels there is no remainder for the common and, as Jupiter's computations show, the preferred would bear the entire burden. And a quick write-off, while it might

meet the conservative accounting test for handling losses, would be entirely at the expense of the preferred; the unfairness of such a proposal outweighs any benefits which might be received by adoption of the "zero" method. As to similar refund liabilities incurred by oil and gas ventures, such established practices are not persuasive under the certificate requirement of a sound accounting practice.

## (5)

I turn now to the question of whether the preferred should be given credit for the $516,374 reserve which Jupiter acquired in the merger with Commonwealth. This was taken into corporate income in 1966 and the preferred stockholders were given no credit for it. Jupiter argues that it is not a fund nor an amount of money nor an asset of any value, but only an accounting notation designed to give notice of a potential liability. It also contends that, although warranted by Commonwealth to be adequate, the reserve is inadequate. I regard the latter argument as irrelevant since it implicitly seeks to have the Court decide issues of rights under the 1961 agreement of merger between Jupiter and Commonwealth.

There was evidence as to whether the $516,374 reserve was funded or unfunded. But whether funded or not, the reserve still had a value for balance sheet purposes. As such it represented, at the time of merger, a value which reduced the shareholder's equity by $516,374. It was on the books at the time of merger, there were assets to cover it, and it is reasonable to infer that it was taken into consideration by Jupiter in negotiating the merger and its terms. And the warranty clause in that agreement gives a further indication of this.

The reserve appeared on Commonwealth's 1961 balance sheet and on Jupiter's consolidated balance sheets for 1962, 1963, 1964 and 1965. Thus, this item was on the books at the time of merger and remained

as a reserve for "severance tax" on Jupiter's books up to the time when the dispute as to gas gathering revenues arose. In the face of this, it is neither fair, reasonable nor appropriate to ignore its existence when the obligation which it was designed to cover in fact becomes fixed, and, at the same time charge the entire amount of the obligation to the preferred stockholders.

I conclude that in determining treatment of the severance tax liability as between the two classes of stockholders and in computing gas gathering income, the reserve of $516,374 is to be credited against the escrow obligation of $1,602,298.

## (6)

There is no single absolutely correct method to be used for treatment of the severance tax liability. Various proposals have been suggested and argued. On balance I conclude that the severance tax should be deducted from gas gathering income generally in accordance with the pattern of liability for payments of the tax into the escrow account, as imposed by the FPC. At the time when that became fixed the fourth quarter of 1965 was still "open." Hence the initial requirement of $252,298 will be charged against gas gathering income for that period. Thereafter, $81,000 per quarter ($27,000 per month) will be charged until the entire escrow is "funded." As to the off-setting entries (for purposes of determining gas gathering income between the two stockholder groups), the preferred in effect will be "credited" with the $516,374 reserve beginning in the fourth quarter of 1965. The initial requirement of $252,298 will be charged against that and the balance will be reduced until exhausted by the $81,000 quarterly charges.

This appears to be fair, reasonable and appropriate. The FPC obligation is provided for and, at the same time, the preferred may receive dividends from whatever is left. In effect, the preferred

will still bear the greater part of the escrow burden, but the harshness of the zero method is eliminated. As between the preferred and the common, the solution is, first, fair and reasonable and, second, as far as the FPC obligation on the corporation is concerned, it is appropriate.

IV

The parties have argued other matters.

(1)

■ Jupiter contends that, assuming accrued and unpaid dividends, its failure to pay arose from a bona fide controversy as to its obligation and for this reason there has been no default.

In the complaint plaintiffs pray for construction of the Certificate of Incorporation and ask the Court "to declare the rights of the preferred stockholders, and to order the officers" to call a special meeting of stockholders.

The charter provides that:

"Whenever * * * accrued and unpaid dividends on the Preferred Stock shall be in arrears [in the specified amount] * * * the holders of * * * Preferred Stock shall have * * * the exclusive right * * * to elect * * * [a minimum majority of directors] * * * until such time as all accrued and unpaid dividends on Preferred Stock shall have been paid in full * * *."

■ Jupiter's argument that any obligation to pay preferred dividends is "conditional" until there has been a judicial determination of the dispute is without foundation and unsupported by authority. The rights of the respective stockholder classes are contract rights and it is necessary to look to the charter to ascertain what those rights are. Ellingwood v. Wolf's Head Refining Co., 1944, 27 Del. Ch. 356, 38 A.2d 743, 154 A.L.R. 406. Jupiter's charter does not contain any requirement, explicit or implicit, as to

judicial determination of dividends and the Court cannot put it there. And this is so whether the dispute is bona fide or not. As I read the charter it requires conjunctive findings as to (a) accrued and unpaid dividends and (b) arrearage in the payment of such dividends. And once those findings have been made, then the preferred stockholders "shall," in the mandatory language of the charter, have the right to majority control. For this reason, Jupiter's citation of authority as to condition precedent is wide of the mark: a definitive (judicial) determination is not a *sine qua non* to the existence of default voting rights. The Court may find such rights or identify or enforce them. It cannot create them.

(2)

■ As to Jupiter's contention that it should be regarded as a depositor in an interpleader suit, I can only say that it is not. The suit is not of that character, Jupiter has not taken the position of an indifferent stakeholder awaiting a judgment between conflicting claimants. Such a position might have been assumed by the corporation after independent counsel appeared for it, but at all times the individual defendants, management, and the corporation have actively opposed plaintiffs' contentions in the suits. In the face of so much adversarial history, the Court cannot now put an interpleader label on any of the defendants. Hence Jupiter is not entitled to the "protective relief" due an interpleader.

(3)

■ Jupiter also argues that plaintiffs are not entitled to relief because it has "set apart" a sufficient amount to cover maximum dividends payable on its preferred stock. It thus relies on Fourth A 3 of the charter, which states:

"The term 'accrued and unpaid dividends' * * * shall mean dividends * * * from the date from which

dividends accrued to the date as of which accrued and unpaid dividends are being determined, less the aggregate amounts of all dividends theretofore declared and paid or set apart for payment * * *."

Under this clause dividends must either be paid or set apart for payment. Here dividends were not paid. Were they "set apart" for payment?

Early in the controversy Jupiter opened a special bank account into which it put all gas gathering revenues and from which it paid expenses which it considered proper to allocate to the gas gathering system. Assuming the balance was at all times sufficient to cover preferred dividends, that is not a "setting apart for payment" of a dividend under the Jupiter charter nor under our law. Certainly it created no creditor relationship in the preferred stockholders, compare Wilmington Trust Co. v. Wilmington Trust Co., 1940, 25 Del.Ch. 193, 15 A.2d 665; Selly v. Fleming Coal Co., 1935, 7 W.W.Harr. 34, 180 A. 326; and it obviously did not establish a trust fund of the deposit. It remained at all times the property of the company, and its very handling of the account shows that it had not been severed from complete corporate control. In short, there was not that definitive appropriation which under law gives rise to a creditor relationship in the stockholder. See 11 Fletcher Cyclopedia Corporations (Perm. Ed.) § 5321.

Thus without payment of dividends, or declaration of dividends, or effective setting apart of funds for payment, the holders of preferred stock were not "entitled to receive" dividends by Board action. It follows that Jupiter's arguments based on a setting apart of funds for dividends is not an impediment to the exercise of default voting rights by the holders of preferred stock.

### (4)

As to Jupiter's argument based on estoppel, this appears to be moot in light of the ruling in Civil Action 2630 and Mr. Koven's statement at argument that Mr. McDonald, who is a plaintiff in each action, is not bound by any estoppel contentions.

Finally, as to other contentions, I can only say that I have considered them in making the rulings stated in this opinion.

### V

When the foregoing rulings are applied to the undisputed revenue and expense figures for the periods in dispute, it appears that there will be gas gathering income in an aggregate amount equivalent to three full quarter-yearly dividends. For this reason it may not be necessary to decide plaintiffs' contention that default voting rights have vested in the preferred stockholders under the contractual indebtedness provisions of the charter. I therefore defer a ruling on that phase of the case until I have considered what order is appropriate to this point.

While considering the question of relief, I am aware that the corporate charter provides that the preferred stockholders shall have majority control of the Board "until such time as all accrued and unpaid dividends on Preferred Stock shall have been paid in full," at which time majority control revests in the common stockholders. Jupiter states that it proposes to pay any dividends found to be payable as a result of the Court's decision and thus seeks to invoke the above provision to block the election which plaintiffs seek.

I am aware of the several Delaware decisions already cited involving transfer voting rights, Ellingwood v. Wolf's Head Oil Refining Co., supra; Vogtman v. Merchants' Mortgage & Credit Co., supra; and Petroleum Rights Corporation v. Midland Royalty Corp., supra, and Jupiter's reliance on them.

But in the present state of the matter, I regard it as inappropriate to anticipate what any party will do or any arguments which it may make. The only relief affirmatively sought here is found in the

complaint. The Court has not been asked to make any other determination by way of counterclaim or otherwise. In these circumstances, and upon the assumption made as to gas gathering income for the three periods, an election will be ordered as prayed by plaintiffs in Civil Action 2565. I will consider any application based upon the revesting of majority control in the common stockholders when it is made and in light of the circumstances which exist at that time.

