**John G. BARON, Plaintiff,**

**v.**

**ALLIED ARTISTS PICTURES CORPO-RATION et al., Defendants.**

Court of Chancery of Delaware, New Castle.

Submitted Dec. 2, 1974.

Decided April 22, 1975.

Russell J. Willard and Douglas W. Troll of Hastings & Willard, Wilmington, and Michael R. Newman, Los Angeles, Cal., for plaintiff.

Lewis S. Black, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, and Robert J. Sisk and Eugene H. Zagat, Jr., of Hughes, Hubbard & Reed, New York City, for defendants.

BROWN, Vice Chancellor.

Plaintiff originally brought suit as a stockholder of the defendant Allied Artists Pictures Corporation, a Delaware corporation, (hereafter "Allied") to have the 1973 election of directors declared illegal and invalid and to have a master appointed to conduct a new election pursuant to 8 Del. C. §§ 225 and 227. He has since filed a second action seeking the same relief as to the 1974 election of directors, and the two causes have been consolidated for decision based upon the cross-motions of the parties for summary judgment. Both sides to the controversy agree that there is no material dispute of fact and that the matter is a proper one for determination by summary judgment.

Plaintiff charges that the present board of directors of Allied has fraudulently perpetuated itself in office by refusing to pay the accumulated dividend arrearages on preferred stock issued by the corporation which, in turn, permits the preferred stockholders to elect a majority of the board of directors at each annual election so long as the dividend arrearage specified by Allied's certificate of incorporation exists. Defendants contend that the recent financial history and condition of the corporation has justified the nonpayment of the preferred dividend arrearages, at least to the present, and they further ask that the plaintiff's claims be dismissed because they constitute a purchased grievance.

By way of background, Allied was originally started in the mid-1930's as Sterling Pictures Corporation and later changed its name to Monogram Films under which it gained recognition for many B-pictures and western films. In the early 1950's it changed its name to the present one. Around 1953, with the advent of television, it fell upon hard times. Being in need of capital, Allied's certificate of incorporation was amended in 1954 to permit the issuance of 150,000 shares of preferred stock at a par value of $10.00, with the dividends payable quarterly on a cumulative basis. The amended language of the certificate provides that the preferred shareholders are entitled to receive cash dividends "as and when declared by the Board of Directors, out of funds legally available for the purpose . . . ." The amended certificate further provides that

". . . in case at any time six or more quarterly dividends (whether or not consecutive) on the Preferred Stock shall be in default, in whole or in part, then until all dividends in default on the Preferred Stock shall have been paid or deposited in trust, and the dividend thereon for the current quarterly period shall have been declared and funds for the payment thereof set aside, the holders of the Preferred Stock, voting as a class, shall have the right, at any annual or other meeting for the election of directors, by plurality vote to elect a majority of the Directors of the Corporation."

In addition, the amended certificate requires that a sinking fund be created as to the preferred stock into which an amount equal to ten per cent of the excess of consolidated net earnings over the preferred stock dividend requirements for each fiscal year shall be set aside. From this sinking fund the preferred stock is to be redeemed, by lot, at the rate of $10.50 per share.

Thereafter, as to the preferred stock issued under the 1954 offering, regular quarterly dividends were paid through March 30, 1963. Subsequently, Allied suffered losses which ultimately impaired the capital represented by the preferred stock as a consequence of which the payment of dividends became prohibited by 8 Del.C. § 170. Allied has paid no dividends as to the preferred shares since 1963. By September 1964 the corporation was in default on six quarterly dividends and thus the holders of the preferred stock became entitled to elect a majority of the board of directors. They have done so ever since.

As of December 11, 1973 election of directors, Kalvex, Inc. owned 52 per cent of the outstanding preferred stock while owning only 625 shares of Allied's 1,500,000

shares of common stock. Since the filing of the first action herein Kalvex has taken steps to acquire a substantial number of common shares or securities convertible into the same. Thus unquestionably Kalvex, through its control of the preferred shares, is in control of Allied, although its holdings are said to represent only 7½ per cent of the corporation's equity.

Plaintiff points out that the defendant Emanual Wolf, as director, president and chief executive officer of Allied at an annual salary of $100,000, is also president and chief executive officer of Kalvex. Defendant Robert L. Ingis, a director, vice-president and chief financial officer of Allied, is the executive vice-president of Kalvex. Defendants Strauss and Prager, elected as directors by the preferred shareholders, are also vice-presidents of Allied. Of the four directors nominated by management to represent the common stockholders, and duly elected, two serve Allied at salaried positions and two serve as counsel for Allied receiving either directly or through their firms substantial remuneration for their efforts. Plaintiff asserts that for fiscal 1973, the officers and directors of Allied, as a group, received $402,088 in compensation.

Returning briefly to the fortunes of the corporation, in 1964 Allied was assessed a tax deficiency of some $1,400,000 by the Internal Revenue Service. At the end of fiscal 1963, it had a cumulative deficit of over $5,000,000, a negative net worth of over $1,800,000 and in that year had lost more than $2,700,000. As a consequence Allied entered into an agreement with the Internal Revenue Service to pay off the tax deficiency over a period of years subject to the condition that until the deficiency was satisfied Allied would pay no dividends without the consent of Internal Revenue.

Thereafter Allied's fortunes vacillated with varying degrees of success and failure which, defendants say, is both a hazard and a way of life in the motion picture and theatrical industry. Prior to fiscal 1973

there were only two years, 1969 and 1970, when its preferred capital was not impaired. But plaintiff points out that in 1970 the preferred capital surplus was $1,300,000 at a time when the preferred dividend arrearages were only $146,500. And, while recognizing that Allied suffered net income loss of over $3,000,000 in the following year, 1971, plaintiff further points out that during several years between 1964 and 1973 the corporation had, on occasion, sufficient net income to contribute to the sinking fund or to pay the dividend arrearages. Defendants argue that when viewed overall it was not until the end of the fiscal year terminating June 30, 1973 that Allied had, for the first time, a capital surplus available for preferred dividends, and that this surplus was only $118,000, or less than half of the amount necessary to liquidate the preferred dividend arrearage. (If this constitutes a dispute of fact, I do not consider it to be material for the purpose of this decision.)

Starting with 1972, Allied's financial condition began to improve substantially. It acquired the rights to, produced and distributed the film "Cabaret," which won eight Academy Awards and became the largest grossing film in Allied's history up to that time. It thereafter took a large gamble and committed itself for $7,000,000 for the production and distribution of the film "Papillon." In his initial litigation plaintiff complained vigorously of this, but he has since abandoned his objection since "Papillon" proved to be even a greater financial success than "Cabaret." For fiscal 1973 Allied had net income in excess of $1,400,000 plus a $2,000,000 tax carry-over remaining from its 1971 losses. Presumably its financial situation did not worsen prior to the December 11, 1974 election of directors although unquestionably it has gone forward with financial commitments as to forthcoming film releases.

Throughout all of the foregoing, however, the Internal Revenue agreement, with its dividend restriction, persisted. Prior to the 1973 election the balance owed was

some $249,000 and as of the 1974 election, one final payment was due, which presumably has now been made. Prior to the 1973 election, Allied was in default on forty-three quarterly preferred dividends totalling more than $270,000. By the time of the 1974 election, the arrearages exceeded $280,000.

Without attempting to set forth all of the yearly financial data relied upon by the plaintiff, his position is, quite simply, that for one or more years since the preferred shareholders have been in control of Allied the corporate financial statements show that there was either a net income for the preceding fiscal year or a capital surplus at the end of the preceding fiscal year in an amount larger than the accumulated preferred dividend arrearages, and that consequently the board of directors elected by the preferred shareholders, being only a caretaker board, had a duty to use such funds to pay the dividend arrearage, and also the balance due on the Internal Revenue agreement, if necessary, and to thereupon return control of the corporation to the common stockholders at the next annual election. Specifically, plaintiff charges that the corporation had both the legal and financial capability to pay off the Internal Revenue obligation and the dividend arrearage prior to both the 1973 and 1974 annual election of directors which, had it been done, would have prevented the preferred shareholders, as controlled by Kalvex, from reelecting a majority of the board. Thus, plaintiff seeks the Court to order a new election at which Allied's board of directors will be elected by the common stockholders.

Plaintiff stresses that he is not asking the Court to compel the payment of the dividend arrearages, but only that a new election be held because of the preferred board's allegedly wrongful refusal to do so. Since the certificate of incorporation gives preferred shareholders the contractual right to elect a majority of the directors as long as dividends are six quarters in arrears, plaintiff, in effect, is asking that

this contractual right be voided because of the deliberate refusal of the preferred shareholders to see themselves paid as soon as funds became legally available for that purpose.

Plaintiff has cited a wealth of authorities standing for various accepted propositions of corporate law, the most prominent of which hold that incumbent directors cannot issue stock without consideration or otherwise manipulate corporate machinery so as to maintain or perpetuate control in a particular group of stockholders. Condec Corporation v. Te Lunkenheimer Company, Del.Ch., 230 A.2d 769 (1967); Schnell v. Chris-Craft Industries, Inc., Del.Supr., 285 A.2d 437 (1971); Bowen v. Imperial Theaters, Inc., 13 Del.Ch. 120, 115 A. 918 (1922); Kingston v. Home Life Ins. Co., 11 Del.Ch., 258, 101 A. 898 (1917). Although plaintiff contends that in principle this is what the defendants are doing here, he offers no authorities which apply this prohibition to a factual situation such as the present one.

■■■ Despite the approach that plaintiff attempts to take, I fail to see how his relief can be granted without reaching the question of whether the dividend arrearages should have been paid. While preferences attaching to stock are the exception and are to be strictly construed, Gaskill v. Gladys Belle Oil Co., 16 Del.Ch. 289, 146 A. 337 (1929); Goldman v. Postal Telegraph, D.C.Del., 52 F.Supp. 763 (1943), it is well established that the rights of preferred stockholders are contract rights. In Petroleum Rights Corporation v. Midland Royalty Corp., 19 Del.Ch. 334, 167 A. 835 (1933) a somewhat similar provision of the corporate charter extended to preferred shareholders the right to elect a majority of the board when six quarterly dividends became in arrears, which right continued *"so long as the surplus* . . . applicable to the payment of dividends *shall be insufficient to pay all accrued dividends."* The Chancellor there held that as long as there was the prescribed default in dividends and the surplus remained insufficient, the pre-

ferred stockholders were entitled to elect a majority of the board. It was argued to him that this right of election and control was limited by the language "so long as the surplus . . . shall be insufficient" and that the accumulation of a surplus sufficient to pay all accrued dividends constituted a condition subsequent, the existence of which would forthwith defeat the right to elect control. This view was rejected, on the theory that if accepted it would mean that the sole purpose of such a scheme would be to put the preferred in control to force a payment of passed dividends once a dividend fund became available. The Chancellor concluded that a shift of control should not be made to turn on the personal interests of the preferred shareholders in dividends alone but, in addition, on the consideration that if surplus fell below unpaid dividends the time had arrived to try a new management. 167 A. 837. He also stated as follows at 167 A. 836:

". . . if the surplus does in fact exceed the six quarterly dividends in arrear and the preference stock should elect a majority of the board and the board should resolve not to pay the dividends, the right of the preference stock to continue to elect a majority of the board would undoubtedly terminate."

■ I interpret this to mean that the contractual right to elect a majority of the board continues until the dividends can be made current in keeping with proper corporate management, but that it must terminate once a fund becomes clearly available to satisfy the arrearages and the preference board refuses to do so. Plaintiff seeks to limit this requirement to a mere mathematical availability of funds, and indeed the charter language in *Petroleum Rights* may have intended such a result. Here, however, Allied's charter, and thus its contract with its preferred shareholders, does not limit the right merely until such time as a sufficient surplus exists, as it did in *Petroleum Rights*, but rather it entitles the preferred shareholders to their dividends only "as and when declared by the Board of Directors, out of funds legally available for the purpose." This obviously reposes a discretion in Allied's board to declare preferred dividends, whether it be a board elected by the common or by the preferred shareholders.

The general rule applicable to the right to receive corporate dividends was succinctly stated by Justice Holmes in Wabash Ry. Co. v. Barclay, 280 U.S. 197, 203, 50 S.Ct. 106, 107, 74 L.Ed. 368 (1930):

"When a man buys stock instead of bonds he takes a greater risk in the business. No one suggests that he has a right to dividends if there are no met earnings. But the investment presupposes that the business is to go on, and therefore even if there are net earnings, the holder of stock, preferred as well as common, is entitled to have a dividend declared only out of such part of them as can be applied to dividends *consistently with a wise administration of a going concern.*" (Emphasis added.)

■ Although one purpose of allowing the preferred to elect a majority of the board may be to bring about a payment of the dividend delinquencies as soon as possible, that should not be the sole justification for the existence of a board of directors so elected. During the time that such a preference board is in control of the policies and business decisions of the corporation, it serves the corporation itself and the common shareholders as well as those by whom it was put in office. Corporate directors stand in a fiduciary relationship to their corporation and its shareholders and their primary duty is to deal fairly and justly with both. Condec Corporation v. Te Lunkenheimer Company, *supra*; Yasik v. Wachtel, 25 Del.Ch. 247, 17 A.2d 309 (1941).

■ The determination as to when and in what amounts a corporation may prudently distribute its assets by way of dividends rests in the honest discretion of

the directors in the performance of this fiduciary duty. Eshleman v. Keenan, 22 Del.Ch. 82, 194 A. 40 (1937), aff'd 23 Del. Ch. 234, 2 A.2d 904; Treves v. Menzies, 37 Del.Ch., 330, 142 A.2d 520 (1958). Before a court will interfere with the judgment of a board of directors in refusing to declare dividends, fraud or gross abuse of discretion must be shown. Moskowitz v. Bantrell, Del.Supr., 41 Del.Ch. 177, 190 A.2d 749 (1963). And this is true even if a fund does exist from which dividends could legally be paid. As stated by the Chancellor in Eshleman v. Keenan, *supra*, at 194 A. 43:

"That courts have the power in proper cases to compel the directors to declare a dividend, is sustained by respectable authorities. But that they should do so on a mere showing that an asset exists from which a dividend may be declared, has never, I dare say, been asserted anywhere. In such a case a court acts only after a demonstration that the corporation's affairs are in a condition justifying the declaration of the dividend as a matter of prudent business management and that the withholding of it is explicable only on the theory of an oppressive or fraudulent abuse of discretion."

■ Plaintiff here appears to be asking that an exception be carved from these well established principles where the non-payment of dividends and arrearages results in continued control by the very board which determines not to pay them. As I understand his argument, he asks for a ruling that a board of directors elected by preferred shareholders whose dividends are in arrears has an absolute duty to pay off all preferred dividends due and to return control to the common shareholders as soon as funds become legally available for that purpose, regardless of anything else. Thus, in effect, he would have the court limit the discretion given the board by the certificate of incorporation, and make the decision to pay arrearages mandatory upon

the emergence of a lawful financial source even though the corporate charter does not require it (as perhaps it did in *Petroleum Rights*). He has offered no precedent for such a proposition, and I decline to create one.

■ Plaintiff's attempt to distinguish his action by asserting that he does not seek to compel the payment of the dividend arrearages, but only to return control to the common stockholders, has a hollow ring. In either case the basic question is whether or not the board has wrongfully refused to pay dividends even if funds did exist which could have been used for such purpose. The established test for this is whether the board engaged in fraud or grossly abused its discretion. The mere existence of a legal source from which payment could be made, standing alone, does not prove either.

■ When the yearly hit-and-miss financial history of Allied from 1964 through 1974 is considered along with the Internal Revenue obligation during the same time span, I cannot conclude, as a matter of law, that Allied's board has been guilty of perpetuating itself in office by wrongfully refusing to apply corporate funds to the liquidation of the preferred dividend arrearages and the accelerated payment of the Internal Revenue debt. Thus I find no basis on the record before me to set aside the 1974 annual election and to order a new one through a master appointed by the court.

■ This also applies to plaintiff's argument that Allied has failed to make the required payments into the sinking fund so as to gradually redeem the preferred stock and thus systematically reduce the accumulation of the preferred dividend arrearage. It is not disputed that the legal advice and decision to defer annual contributions to the sinking fund pending rectification of Allied's financial position was given and made prior to the election of the first

board of directors by the preferred shareholders, and thereafter merely continued by them.

Moreover, even accepting plaintiff's figures, the sum that could have been contributed to the sinking fund since 1963, under the formula set forth in the corporate charter, would not have been sufficient to redeem all outstanding preferred stock by the time of the elections in question. Thus, even if sinking fund contributions had been religiously made each year without regard to Allied's other obligations and losses, there would still have been preferred stock and preferred dividend arrearages, albeit in a lesser amount.

It is clear, however, that Allied's present board does have a fiduciary duty to see that the preferred dividends are brought up to date as soon as possible in keeping with prudent business management. Petroleum Rights Corporation v. Midland Royalty Corp., *supra*; Eshleman v. Keenan, *supra*. This is particularly true now that the Internal Revenue debt has been satisfied in full and business is prospering. It cannot be permitted indefinitely to plough back all profits in future commitments so as to avoid full satisfaction of the rights of the preferred to their dividends and the otherwise normal right of the common stockholders to elect corporate management. While previous limitations on net income and capital surplus may offer a justification for the past, continued limitations in a time of greatly increased cash flow could well create new issues in the area of business discretion for the future.

Because of the above conclusions, I find it unnecessary to deal with the contention of defendants' that the complaints should be dismissed because of embodying a purchased grievance by plaintiff.

Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted. Order on notice.