John R. BURTON, suing on behalf of himself and all other similarly situated holders of $7 Cumulative Second Preferred Stock of European Gas & Electric Company, Plaintiff,

v.

EXXON CORPORATION, European Gas & Electric Company, R.F. Dilworth, D.G. Gill and W.W. Stewart, Defendants.

No. 81 Civ. 5040 (GLG).

United States District Court, S.D. New York.

March 30, 1984.

As Amended April 18, 1984.

---

See also D.C., 536 F.Supp. 617.

Dickstein, Shapiro & Morin, New York City, and Chestnut & Brooks, P.A., Minneapolis, Minn., for plaintiff and plaintiff class; Sidney Dickstein, Leonard Garment, New York City, Peter W. Morgan, Washington, D.C., and Thomas H. Graham, Minneapolis, Minn., of counsel.

Sullivan & Cromwell, and Kenneth M. Bialo, New York City, for defendant Exxon Corp.; Robert M. Osgood, Robert J. Lack, Richard E. Simpson, New York City, of counsel.

Walsh & Frisch, New York City, for defendant European Gas & Electric Company; E. Roger Frisch, Jerome K. Walsh, New York City, of counsel.

Satterlee & Stephens, New York City, for defendants R.F. Dilworth, D.G. Gill and W.W. Stewart; Robert M. Callagy, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

This is a class action brought by plaintiff John R. Burton on behalf of himself and all other similarly situated holders of $7 Cumulative Second Preferred Stock of the European Gas & Electric Company ("Eurogasco") against Eurogasco, the Exxon Corporation ("Exxon"), R.F. Dilworth, D.G. Gill, and W.W. Stewart. The plaintiff alleges that the defendants breached their fiduciary duties to the Second Preferred stockholders, and seeks various forms of equitable relief. Briefly stated, the plaintiff argues that the defendants engaged in a course of conduct which depleted the assets of Eurogasco to the detriment of the plaintiff class. From 1977 through 1980, Eurogasco received over $9 million in compensation for the nationalization of its properties in Hungary. Eurogasco's Board of Directors used this money to pay dividend arrearages on the First Preferred Stock owned by Exxon and the excess money was deposited with Exxon. The plaintiff argues that instead of engaging in self-dealing the defendants could have invested the entire fund so as to enable Eurogasco to make payments to the plaintiff class. The plaintiff seeks an order requiring Exxon to return to Eurogasco the sum of $8,641,147, which represents the dividends paid to Exxon plus the profit Exxon has made on the dividends. In addition, the plaintiff seeks an order enjoining the defendants from dissolving Eurogasco without complying with Eurogasco's Certificate of Incorporation and Delaware law. This matter having come on for trial, this opinion will constitute the Court's findings of facts and conclusions of law under Fed. R.Civ.P. 52(a).

## FACTS

### I. The Parties

Eurogasco is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business at 1251 Avenue of the Americas, New York, New York. Eurogasco has issued and outstanding 22,100 shares of $7 Cumulative First Preferred Stock, Series A (the "First Preferred"), 7,336 shares of $7 Cumulative Second Preferred Stock, Series A (the "Second Preferred") and 2,098,600 shares of common stock (the "Common Stock").

The majority stockholder in Eurogasco is Exxon. Exxon is a corporation duly organized and existing under the laws of the State of New Jersey, with its principal place of business at 1251 Avenue of the Americas, New York, New York. It owns 22,100 shares (100%) of the First Preferred, 1,945 shares (26.5%) of the Second Preferred, and 1,908,190 shares (90.9%) of the Common Stock of Eurogasco.

In addition to Exxon, Eurogasco has approximately 150 public stockholders. Of those public stockholders, approximately 120 are holders of the Second Preferred. John R. Burton ("Burton") owns and, at all times pertinent to this action, has owned 10 shares of the Second Preferred. Burton is a citizen of the State of Ohio.

At all times pertinent to this action, R.F. Dilworth ("Dilworth"), D.G. Gill ("Gill"), and W.W. Stewart ("Stewart") constituted the entire Board of Directors of Eurogasco. Dilworth and Gill were directors of Eurogasco during the period 1977–1981. Stewart served as a director from December 29, 1977, when he replaced P.W. Moyer as director, through 1981.

### II. Background of Eurogasco

Eurogasco was organized in Delaware in 1931. It was in the business of exploring for, producing, transporting, and selling oil and natural gas in Hungary, Austria and Czechoslovakia. These activities ceased, however, in the late 1930's and the 1940's

as a result of World War II and subsequent nationalization.

Prior to World War II, Eurogasco transferred substantially all of its assets to two wholly-owned subsidiaries, an Austrian company named Gewerkschaft Austrogasco and a Hungarian company named Magyar Amerikai Olujipari Resvenytarsasag ("MOART"). These subsidiaries held certain oil and natural gas concessions and other property rights in Austria and Hungary, respectively. During World War II, Eurogasco's Austrian subsidiary lost all its assets. In 1941, the Hungarian Government assumed control of MOART. Eurogasco never regained control of MOART during the war or during the subsequent Russian military occupation. In September 1948, all of MOART's assets were nationalized by the Hungarian Government. Since 1948, Eurogasco's principal activity has been to pursue claims for compensation for the lost assets of its two subsidiaries. Although its Certificate of Incorporation does not limit its business purpose or activities to the business in which it was engaged prior to World War II, with all of its assets destroyed or seized, Eurogasco terminated all business activities. Thus, for the last thirty-five years, Eurogasco's only activity, and its sole reason for continued corporate existence, has been to prosecute war damage and nationalization claims for its lost assets.

In the 1950's, the Austrian Government and Eurogasco entered into negotiations on Eurogasco's claims regarding its former Austrian assets. During 1961–1964, Eurogasco recovered $979,702 from the Austrian Government in connection with mining rights, royalty claims, and its interest in an oil field.

In 1956, Eurogasco filed a claim for more than $60,000,000 with the Foreign Claims Settlement Commission (the "Commission"), regarding war damage and nationalization of its former assets in Hungary. The Commission awarded Eurogasco $28,002,035. Initially only a small portion of this award was satisfied since the principal source of funds was a limited amount of Hungarian assets in the United States. Eurogasco received $987,201 during the period 1959–1967. On March 6, 1973, the United States and Hungary entered into the United States-Hungarian Claims Agreement (the "Claims Agreement"), pursuant to which Hungary agreed to pay compensation with respect to Eurogasco's claim. Commencing in September 1977, the Government of Hungary made a series of payments to the United States Treasury under the Claims Agreement, and the United States Treasury, in turn, made a series of payments to Eurogasco. Although Eurogasco's claims were extinguished by the Claims Agreement, Eurogasco subsequently received payments amounting to approximately one-third of its outstanding award against the Hungarian Government. It received the sum of $9,060,128 during the period of 1977–1980. On forwarding the 1980 payment to Eurogasco, the United States Treasury advised Eurogasco that this constituted its final payment under the Claims Agreement, and that Eurogasco should not expect to receive any additional payments with respect to the nationalized Hungarian assets.

Eurogasco used the payments referred to above to repay its indebtedness to Exxon, and to pay dividends.

### III. *Exxon's Interest in Eurogasco*

Exxon had no role in Eurogasco's formation. When Eurogasco was formed, its promoters took Second Preferred stock. The First Preferred stock was reserved for later issuance and was designed to serve as an inducement to an outside investor who could supply the capital needed to fund Eurogasco's operations. Exxon was approached to fulfill this role. Commencing in 1933, Exxon made a series of loans and capital contributions to Eurogasco.

During the period of 1933–1934, Exxon received 22,100 shares of Eurogasco's First Preferred [1] and 578,500 shares of Eurogas-

---

**1.** In accordance with the authorization con-        tained in Article Fourth of Eurogasco's Certifi-

co's Common Stock in return for conversion of certain loans and capital contributions, amounting to $2,210,000, that Exxon had made to Eurogasco. In 1938, Eurogasco issued 1,310,240 shares of Common Stock to Exxon in exchange for Exxon's agreement to lend Eurogasco the funds it required to carry on its operations from August 1, 1937 to December 31, 1938.[2] In 1938, Exxon purchased 1,945 shares of the Second Preferred and 19,450 shares of the Common Stock from other stockholders.

In addition to the above infusions of capital, Exxon also made loans to Eurogasco. The amount of the loans gradually increased until, in 1960, they reached a total of $2,016,924. These were loans that Eurogasco probably could not have obtained from any other source. For more than two decades Eurogasco made no repayments to Exxon. However, with the inflow of cash from its war damage and nationalization claims, Eurogasco was able to repay Exxon. Thus, commencing in 1961, Eurogasco gradually reduced its indebtedness to Exxon and by 1977 paid off such indebtedness. Exxon did not charge Eurogasco any interest on these loans during the period of 1949–1976, which would have amounted to $2.3 million.

The Fourth Article of Eurogasco's Certificate of Incorporation provides that when accrued dividend arrearages on the First Preferred and the Second Preferred remain unpaid, the exclusive right to vote for Eurogasco's directors (and, except as otherwise provided in the Certificate of Incorpo-

ration or applicable statute, on all other corporate questions) is vested in the holders of the First Preferred and the Second Preferred, voting as one class. Thus, for more than forty years, because Eurogasco has consistently failed to pay dividends on its preferred shares and Exxon has owned more than 80% of those shares, Exxon has controlled Eurogasco.

Exxon first gained representation on the Eurogasco Board of Directors when two Exxon representatives were elected in 1935. By 1937, seven of the twelve Eurogasco directors, as well as all Eurogasco officers, were employees of Exxon or its affiliates. As the original Eurogasco founders or their representatives who were on the Eurogasco Board of Directors resigned or died, the Eurogasco Board was gradually reduced in size until 1975, when it was set at three members. Since 1977, all Eurogasco directors have been employees of Exxon or its affiliates. All of Eurogasco's current officers and directors are employees of Exxon.

During the pertinent period 1977–1980, defendants Dilworth, Gill, and Stewart were the directors of Eurogasco, while also employees of Exxon.

Dilworth was a director and the Vice President of Eurogasco from 1972 through 1982[3] and, at the same time, a Senior Financial Advisor in the Controller's Department of Exxon. He had been employed by Exxon or its affiliates for more than 33 years. Gill has served as a director and the President of Eurogasco since 1973. He

cate of Incorporation, Eurogasco created the First Preferred pursuant to a "Certificate of Designation, Preferences and Rights, and of Number of Shares of $7 CUMULATIVE FIRST PREFERRED STOCK, SERIES A, by Resolution of the Board of Directors" (the "Certificate of Designation"), dated December 8, 1933. The number of First Preferred shares that Eurogasco was authorized to issue, initially limited to 5,000 by the Certificate of Designation, was increased, in four steps, to 23,400 pursuant to "Certificates of Increase" during the period 1934–1936. Pursuant to a "Certificate of Decrease" dated January 11, 1938, this number of First Preferred shares was decreased to 22,100, which is the total number of such shares presently issued and outstanding.

2. Eurogasco issued these additional shares of Common Stock to Exxon pursuant to a February 15, 1938, amendment to the Certificate of Incorporation, which increased the total number of Common Stock shares which Eurogasco was authorized to issue from 1,000,000 to 2,100,000.

3. On December 2, 1982, Dilworth was succeeded by R.L. Wolf as a director of Eurogasco. Wolf, who has served as director ever since then, is an Assistant Controller of Exxon and has been employed by Exxon or one of its affiliates for more than 26 years.

holds the position of Senior Counsel at Exxon and is the only attorney to have served on Eurogasco's Board of Directors since 1973. He has been employed by Exxon or its affiliates for more than 23 years. Stewart has served as a director of Eurogasco since December 29, 1977 [4] and is an Assistant Treasurer of Exxon. He has been employed by Exxon or its affiliates for more than 30 years.

Since 1936, Eurogasco has not maintained offices or hired administrative personnel separate from those maintained or retained, respectively, by Exxon.

Thus it is obvious that at all times relevant to this action, Exxon, through its stock ownership, has elected and controlled Eurogasco's Board of Directors, and has made all management decisions regarding Eurogasco, its operations, the conduct of its business and the handling of its assets. The plaintiff class has had no voice in the decisions made by Eurogasco's Board.

IV. *Actions by the Board of Directors*

During the period 1977–1980, the Board of Directors took several actions that, the plaintiff claims, constituted a breach of the defendants' fiduciary duties.

A. The Dividend Payments

Eurogasco's stockholders have the following rights to dividend payments pursuant to the Certificate of Incorporation and the Certificate of Designation.

The First Preferred has preference over all other classes of stock respecting the payment of dividends. Article Fourth of the Certificate of Incorporation provides that the dividends on the First Preferred "shall be cumulative, so that all unpaid deficiences (if any) in dividends accrued on the cumulative First Preferred stock (but without interest) ... shall ... be declared and paid, or declared and funds for the payment thereof set apart, before any dividend ... shall be declared or set apart for or paid on any other class of stock." The

Certificate of Designation provides that the dividend rate for the First Preferred shall be seven dollars per share per annum, payable quarterly.

Pursuant to Article Fourth of the Certificate of Incorporation, holders of the Second Preferred are entitled to cumulative dividends of $7 per share per annum, payable quarterly, after the First Preferred and in preference to dividends on the Common Stock. The provisions that grant the Second Preferred a subordinated status to the First Preferred with respect to dividends are printed on the back of the stock certificates.

Pursuant to Article Fourth of the Certificate of Incorporation, dividends may not be paid to holders of the Common Stock until all accrued dividends, including those for the current quarter, are paid to holders of the First Preferred and Second Preferred.

From the date of its creation in 1931, through 1976, Eurogasco had never paid any dividends, and consequently substantial dividend arrearages had accumulated on the First Preferred and Second Preferred. As of September 1, 1977, the dividend arrearages amounted to $6,498,975 on the First Preferred and $2,332,771 on the Second Preferred.

As discussed above, under the Claims Agreement Eurogasco received $9,060,128 from 1977 through 1980. In addition, Eurogasco also had interest income of $823,-297, for a total income of $9,883,425. From this, Eurogasco declared and paid dividends.

In September 1977, Eurogasco received its first payment under the Claims Agreement, in the amount of $4,768,901. On December 29, 1977, Eurogasco's Board declared a dividend of $3,134,250, all of which was paid to Exxon, the First Preferred stockholder. This dividend payment reduced Eurogasco's total stockholders' equity to within approximately $35,000 of the minimum capital required to be retained

---

**4.** Stewart replaced P.W. Moyer who had been a director of Eurogasco for a number of years. In 1977, Moyer held the position of Assistant Treasurer for Standard Oil Company of New Jersey. He was employed by Exxon or its affiliates for more than 32 years.

under the provisions of Eurogasco's Certificate of Incorporation.

· In 1978, Eurogasco received an additional $2,002,134 pursuant to the Claims Agreement. In that year, Eurogasco declared and paid a dividend of $232,050, all of which was paid to Exxon as holder of the First Preferred. The dividend reduced Eurogasco's total stockholders' equity to within approximately $40,000 of the minimum capital required to be retained under the provisions of Eurogasco's Certificate of Incorporation.

In 1979, Eurogasco received a payment of $1,821,942 pursuant to the Claims Agreement and subsequently declared and paid a dividend of $386,750, all of which was paid to Exxon as holder of the First Preferred. The dividend reduced Eurogasco's total stockholders' equity to within approximately $70,000 of the minimum capital required to be retained under the provisions of Eurogasco's Certificate of Incorporation.

In 1980, Eurogasco received $467,151 more pursuant to the Claims Agreement. Again, Eurogasco declared and paid a dividend of $386,750, all of which was paid to Exxon as holder of the First Preferred. The dividend reduced Eurogasco's total stockholders' equity to within approximately $85,000 of the minimum required to be retained under the provisions of Eurogasco's Certificate of Incorporation.

Eurogasco's payments of accrued dividends to Exxon were in full compliance with the preference provisions set forth in Eurogasco's Certificate of Incorporation and Certificate of Designation.

As of December 31, 1980, the accrued dividend arrearages on the First Preferred amounted to $2,861,950, and the accrued dividend arrearages on the Second Preferred amounted to $2,499,665. As of December 31, 1981, the accrued dividend arrearages on the First Preferred amounted to $3,171,305, and the accrued dividend arrearages on the Second Preferred amounted to $2,602,369.

The plaintiff claims that the payments of dividends to Exxon, the First Preferred stockholder, were self-dealing and constituted a breach of the defendants' fiduciary duty. As discussed below, the Court concludes that the payments were not in violation of the defendants' fiduciary duty.

**B. Deposit of Money with Exxon**

With the receipt in September 1977 of the initial payment from the United States Treasury pursuant to the Claims Agreement, Eurogasco's cash position became positive for the first time since 1936. With this infusion of cash from the United States Treasury, Eurogasco began to deposit some of this money with Exxon. The total amounts of cash Eurogasco had on deposit with Exxon at year-end for the years 1977–1980 were: $294,133 in 1977; $1,575,274 in 1978; $2,657,867 in 1979; and $2,820,089 in 1980.

When Gill made the first deposit in the intercompany account in 1977, he gave instructions that Exxon was to pay interest to Eurogasco on the money. Although an administrative oversight initially delayed the crediting of the interest, interest was later credited retroactively to September 1, 1977, and has been paid every quarter since then. The interest rate that Exxon paid Eurogasco on the cash deposited with it was calculated by reference to yields then generally available on short-term marketable securities.

As of December 31, 1980, Eurogasco had received a total of $823,297 in interest on the amounts that it had on deposit with Exxon during the period 1977–1980. During calendar years 1981 and 1982, Eurogasco received a total of $471,523 and $421,388, respectively, in interest. During 1983, Eurogasco continued to earn interest on the funds that it had on deposit with Exxon.

The plaintiff claims that these "upstream loans" from Eurogasco to Exxon were given at insufficient rates of interest and constituted a breach of the defendants' fiduciary duty. As discussed below, the Court

concludes that there was no breach of the defendants' fiduciary duty.

## C. Decision to Seek Dissolution

In or around March 1981, Eurogasco's Board of Directors determined that Eurogasco's continuation served no useful purpose, and therefore deemed it advisable that Eurogasco should be dissolved. Pursuant to Article Fourth of the Certificate of Incorporation, however, Eurogasco cannot voluntarily dissolve, liquidate or wind up its affairs without the consent of at least two-thirds of both the First Preferred and Second Preferred, each voting as a separate class, either in writing or at a special meeting called for that purpose. The directors decided, therefore, to obtain a stockholder vote on whether Eurogasco should be dissolved.

At a meeting on March 3, 1981, Eurogasco's Board of Directors unanimously adopted the following resolution (the "Resolution"): "RESOLVED, That the stockholders of European Gas & Electric Company authorize the dissolution of the Corporation and the distribution of the assets of the Corporation in accordance with the laws of the State of Delaware, the Corporation's Certificate of Incorporation and its Certificate of Designation, Preferences and Rights and Numbers of Shares." In a Proxy Statement dated April 27, 1981 (the "Proxy Statement"), mailed to Eurogasco's stockholders with the notice of Eurogasco's annual meeting scheduled for May 28, 1981, Eurogasco's Board of Directors solicited stockholders' votes in support of the Resolution. At the time it mailed the Proxy Statement, Eurogasco's Board made no special effort to reach the holders of the Second Preferred for whom the Board did not possess a current address; nor had the Board done so on any other prior occasion during the times relevant to this proceeding.

The Proxy Statement informed the stockholders that the United States Treasury had advised Eurogasco that it had received its final payment under the Claims Agreement and could not expect to receive any additional payments with respect to its nationalized assets. The Proxy Statement further advised the stockholders that if dissolution were authorized, Eurogasco's remaining assets would be applied first to satisfy third-party debts and liabilities, if any, and thereafter in accordance with the liquidation preferences specified by the Certificate of Incorporation and the Certificate of Designation.[5] The Proxy Statement explained that, pursuant to those liquidation preferences, as of December 31, 1980, the holders of the First Preferred were entitled to receive $5,182,450 on liquidation ($105 per share, totaling $2,320,500 for all 22,100 outstanding shares plus $2,861,950 in accrued dividends) before any distribution could be made to the holders of any other stock. The Proxy Statement further noted that the holders of the Second Preferred and Common Stock would receive no distribution upon dissolution since the estimated assets available for distribution was approximately $2,800,000, an

5. Pursuant to Article Fourth of the Certificate of Incorporation and the Certificate of Designation, the stockholders are entitled to the following rights in the event of dissolution, liquidation or redemption.

The First Preferred has preference over all other classes of stock respecting dissolution, liquidation and redemption. In the event of Eurogasco's dissolution or any other distribution of its assets in total or partial liquidation, the holders of the First Preferred are entitled to receive, preferentially with respect to the holders of other classes of stock, one hundred and five dollars per share plus the amount of all dividends accrued thereon up to the date of such payment (without interest) payable from capital, if neces-

sary. Upon redemption, the holders of the First Preferred are entitled to payment of one hundred and five dollars per share, plus an amount equal to all accrued dividends thereon.

After the First Preferred, the holders of the Second Preferred are entitled to payment of $105 per share plus an amount equal to all accrued but unpaid dividends, payable in preference to any dissolution, liquidation or redemption payment to holders of Common Stock.

In the event of dissolution or liquidation, no payment may be made to holders of the Common Stock until holders of the First Preferred and the Second Preferred have received all payments to which they are entitled.

amount considerably less than the amount to which the First Preferred was entitled.

The Proxy Statement also notified the other stockholders of the following information as to Exxon's intention regarding the proposed dissolution: that Exxon had indicated its intention to vote all of the shares held by it in favor of the Resolution and that if the Resolution was not approved by the required number of shares of the First Preferred and Second Preferred, Exxon might seek the appointment of a receiver for Eurogasco by the Delaware Court of Chancery to carry out the dissolution of Eurogasco and the distribution of its assets in accordance with Delaware law, the Certificate of Incorporation and the Certificate of Designation.

At Eurogasco's annual meeting of stockholders on May 28, 1981, the Resolution of voluntary dissolution received the affirmative vote of 100% of the First Preferred (all owned by Exxon). Of the 7,336 issued and outstanding shares of the Second Preferred, a total of 2,808 shares, including the 1,946 owned by Exxon and 863 owned by others, were voted in favor of the dissolution and 244 shares were voted against the resolution. The remaining 4,284 shares of the Second Preferred were not voted. Under the applicable provisions of the Certificate of Incorporation, each abstention by a holder of the Second Preferred shares was the equivalent of a negative vote. Since the requisite affirmative vote of holders of two-thirds (4,890) of the issued and outstanding Second Preferred shares had not been obtained, the dissolution Resolution was not adopted at Eurogasco's annual meeting on May 28, 1981.

Plaintiff Burton filed this action on August 13, 1981, seeking, among other remedies, an injunction enjoining the dissolution of Eurogasco. On October 7, 1981, Exxon filed a petition seeking the dissolution of Eurogasco in the Court of Chancery of the State of Delaware in and for New Castle. As discussed below, the Court concludes that it will not grant an injunction.

## EVALUATION OF THE BOARD OF DIRECTORS' ACTIONS

### I. *The Governing Law*

■ In this diversity action, the Court is required to follow New York's choice of law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Those rules provide that the law of the state of Eurogasco's incorporation governs the nature and extent of the defendants' fiduciary obligations. *Perlman v. Feldmann*, 219 F.2d 173, 175 (2d Cir.), *cert. denied*, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Box v. Northrop Corp.*, 459 F.Supp. 540, 547 (S.D.N.Y.1978), *aff'd*, 598 F.2d 609 (2d Cir. 1979). Since Eurogasco is incorporated in Delaware, Delaware law governs the plaintiff's claims.

### II. *The Legal Standard By Which to Test the Transactions*

■ Exxon is the majority stockholder of Eurogasco. It nominates all the members of Eurogasco's Board of Directors whose membership during the period of the challenged transactions consisted entirely of officers, directors, or employees of Exxon or affiliates of Exxon. The status of a majority stockholder or parent corporation carries with it a fiduciary duty with respect to the minority stockholders of the subsidiary. *Gabelli & Co., Inc. Profit Sharing Plan v. Liggett Group, Inc.*, 444 A.2d 261, 264 (Del.Ch.1982). Thus, by reason of Exxon's status and domination, it is clear that Exxon owed Eurogasco a fiduciary duty. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 719 (Del.1971); *Gabelli, supra*, 444 A.2d at 264. As part of this fiduciary duty, Exxon and Eurogasco's Board of Directors were required to be fair in their dealings insofar as those dealings affected the interests of the minority stockholders. *Getty Oil Co. v. Skelly Oil Co.*, 267 A.2d 883, 886 (Del. 1970); *Meyerson v. El Paso Natural Gas Co.*, 246 A.2d 789, 790 (Del.Ch.1967).

■ In the absence of divided interests, the judgment of the majority stockholders and/or the board of directors "is presumed made in good faith and inspired by a bona

fides of purpose". *David J. Greene & Co. v. Dunhill International Inc.*, 249 A.2d 427, 430 (Del.Ch.1968). But when the stockholders or directors, who control the making of a transaction and its terms, are on both sides, then the presumption and deference to sound business judgment are no longer present. *Getty Oil, supra*, 267 A.2d at 887; *David J. Greene, supra*, 249 A.2d at 430–31. Intrinsic fairness is then the criterion. *Id.* Thus, there are two tests which have been applied by the Delaware courts to determine the limits of fairness in parent-subsidiary's or majority stockholder-subsidiary's business dealings. *Getty Oil, supra*, 267 A.2d at 887.

■ The intrinsic fairness standard will be applied when the fiduciary duty is accompanied by self-dealing. *Sinclair Oil, supra*, 280 A.2d at 720; *Gabelli, supra*, 444 A.2d at 265. Self-dealing occurs when the majority stockholder or parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the dominant party receives something of value to the exclusion of, and detriment to, the minority stockholders. *Harriman v. E.I. Du Pont de Nemours & Co.*, 411 F.Supp. 133, 152 (D.Del.1975); *Sinclair Oil, supra*, 280 A.2d at 720; *Gabelli, supra*, 444 A.2d at 265. If the transaction is thus to be tested under the intrinsic fairness test, the burden of persuasion is shifted to the defendant who must show the intrinsic fairness of the entire transaction. *Harriman, supra*, 411 F.Supp. at 153–52; *Gabelli, supra*, 444 A.2d at 264.

■ If there is no proof of self-dealing, the business judgment standard is the proper standard by which to evaluate the transactions. *Sinclair Oil, supra*, 280 A.2d at 722. Under the business judgment rule a court will not interfere with the judgment of a board of directors unless there is a showing of fraud or gross abuse of discretion. *Sinclair Oil, supra*, 280 A.2d at 720; *Moskowitz v. Bantrell*, 41 Del.Ch. 177, 190 A.2d 749, 750 (Del.1963).

### III. *Application of the Appropriate Legal Standard to the Contested Transactions*

#### A. The Dividend Payments

■ During the period of 1977–1980, Eurogasco's Board of Directors declared and paid dividends totalling $4,139,800 to Exxon, the First Preferred stockholder. The plaintiff argues that this decision must be evaluated by the intrinsic fairness test. The defendants argue that the business judgment rule should be applied, but as a back-up argument urge that the decision passes muster under either test.

A decision to declare a dividend is a matter ordinarily addressed to the discretion of the board of directors. *Gabelli, supra*, 444 A.2d at 264. The Delaware courts have permitted directors wide latitude in making this decision, which is considered a routine matter. *Id.* The decision, thus, enjoys a presumption of sound business judgment which will not be disturbed by a court in the absence of a disabling factor, *i.e.*, fraud or gross abuse of discretion. *Sinclair Oil, supra*, 280 A.2d at 720; *Moskowitz, supra*, 749 A.2d at 750; *Gabelli, supra*, 444 A.2d at 264; *Baron v. Allied Artists Pictures Corp.*, 337 A.2d 653, 659 (Del.Ch.1975), *appeal dismissed*, 365 A.2d 136 (Del.1976); *Meyerson, supra*, 246 A.2d at 793.

■ The intrinsic fairness test, however, can be applied to a dividend declaration made by a dominated board. *Sinclair Oil, supra*, 280 A.2d at 721. If the dividend is in essence self-dealing, then the intrinsic fairness test is the proper standard by which to evaluate the dividend payments. *Id.*

It must be determined whether the dividend payments by Eurogasco were, in essence, self-dealing by Exxon. There appears to be no Delaware case directly on point. However, the court in *Sinclair Oil, supra*, 280 A.2d at 721, put forth a hypothetical case dealing with a dividend declaration by a dominated board:

[S]uppose a parent dominates a subsidiary and its board of directors. The sub-

sidiary has outstanding two classes of stock, X and Y. Class X is owned by the parent and Class Y is owned by minority stockholders of the subsidiary. If the subsidiary, at the direction of the parent, declares a dividend on its Class X stock only, this might well be self-dealing by the parent. It would be receiving something from the subsidiary to the exclusion of and detrimental to its minority stockholders. This self-dealing, coupled with the parent's fiduciary duty, would make intrinsic fairness the proper standard by which to evaluate the dividend payments.

*Id.* at 721. Comparing this hypothetical with the case at bar, it would seem that the Delaware courts would apply the intrinsic fairness test to evaluate the dividend payments by Eurogasco to Exxon.

■ At the direction of Exxon, Eurogasco declared a dividend on its First Preferred stock only. The dividends resulted in great sums of money being transferred from Eurogasco to Exxon. Not a penny of this sum was received by the Second Preferred stockholders of Eurogasco. Exxon received $4,139,800 in dividend payments from Eurogasco to the exclusion of, and detriment to, the minority stockholders. Thus, the intrinsic fairness test should be applied. *Cf. Sinclair Oil, supra,* 280 A.2d at 721–22 (holding that the business judgment rule, and not the intrinsic fairness test, is to be applied when the minority stockholders receive a proportionate share of the money resulting from a dividend declaration from a dominated board).

The defendants argue, however, that the facts in this case require a different result. They argue that before a plaintiff can invoke the intrinsic fairness test, the parent must usurp for itself a benefit to which the minority stockholders might otherwise have had a right. In the instant case, the defendants point out that the holders of the Second Preferred had no right to recover any dividends between 1977 and 1980 because the dividends on the First Preferred were in arrears. Thus, argue the defendants, the directors did not opt to pay divi-

dends to the exclusion of, or detriment to, the minority stockholders, since one cannot be harmed by the nonreceipt of something to which one is not entitled. The Court disagrees.

■ In determining whether self-dealing has occurred the test is not whether the minority stockholders were entitled to the item transferred but whether the minority stockholders were excluded from, or damaged by, the transfer from the subsidiary to the parent or majority stockholder. Here, the minority stockholders were excluded from the money consequences of the dividend declaration and this was to their detriment because the declaration depleted much of Eurogasco's cash flow. The fact that the plaintiff class was not entitled to a dividend declaration due to the small amount of available cash in comparison to the huge arrearages on the First Preferred is important only in so far as deciding whether the dividend decision was intrinsically fair. In conclusion, the decision to pay dividends to the First Preferred stockholder, Exxon, must be tested under the intrinsic fairness standard.

■ The intrinsic fairness test shifts the burden of proof to the defendants to demonstrate the intrinsic fairness of the dividend declaration. The Court concludes that the defendants have met this burden as demonstrated by the following facts.

Eurogasco received its first payment under the Claims Agreement, in the amount of $4,768,901, in September 1978. After receipt of this payment, the directors recognized the need to satisfy the company's income tax liability and to discharge its remaining indebtedness to Exxon. When evaluating the alternative uses for the remaining money, Gill understood and counseled his fellow directors, that they had to "lean over backwards to be fair" to all stockholders in light of the fact that the directors were employees of the First Preferred stockholder.

Gill testified that when the directors voted in December 1977 on how to apply the

remainder of the funds available, the following factors were considered:

(1) In Gill's judgment as a specialist in international claims, the amount and timing of additional payments to Eurogasco on its Hungarian claims, beyond those received in August 1977, were subject to substantial uncertainty. The United States-Hungarian Claims Agreement provided for payments by Hungary in equal installments over a period of 20 years. However, continued payments under the Claims Agreement—and therefore Eurogasco's receipt of additional payments—depended on the vagaries of trade relations between the United States and Hungary and of diplomatic relations in general between the United States and the Soviet Union. In addition, the payments were subject to reduction for awards to subsequent claimants and for government administrative expenses. Thus, although the terms of the Claims Agreement gave Hungary a number of years to pay the $18.9 million that it had agreed to pay to the United States Treasury with respect to all claims, Gill was aware in August 1977 that Hungary was prepaying a large portion of that amount. By December 1977, Gill and Eurogasco's other directors estimated—fairly accurately as it turned out—that, in addition to the $4.7 million that Eurogasco had then received, Eurogasco would probably receive an additional $3.5 to $4 million from the United States Treasury and that such amount would be paid within the next three years. However, there was no certainty that their funds would be paid so rapidly.

(2) Eurogasco owed its First Preferred stockholder $6.5 million in accrued unpaid dividends. Under Article Fourth of Eurogasco's Certificate of Incorporation, the satisfaction of these dividend arrearages had absolute priority over any payments toward arrearages of the Second Preferred stock or any other payments on the Common Stock.

(3) Eurogasco was a moribund company which had paid no dividends during the entire 46 years of its existence. It had no business, no assets other that its claims against the Hungarian government, and no employees. It had no means of engaging in any other business other than the collection of its claim, which was its sole corporate purpose.

(4) Based on the limited funds Eurogasco had received and the then-prevailing interest rate, a decision not pay to dividends until sufficient amounts had accumulated to cover the arrearages on the First Preferred and Second Preferred would have meant that the First Preferred would have been required to wait until the next century to receive any payments on its arrearages.

(5) Unlike the situation with large companies which could spread the risk over a large number of oil and gas ventures, the limited funds in Eurogasco's treasury made it in Gill's view extremely imprudent for Eurogasco to gamble by investing those funds in any such ventures.

Eurogasco's circumstances led to the conclusion that retention of Eurogasco's funds was not a reasonable course to adopt, and that the company should instead begin to pay off the arrearages on the First Preferred in accordance with the provisions of the Certificate of Incorporation. As of December 29, 1977, Eurogasco's sole assets were the funds that it had on deposit with Exxon as a consequence of the September payment from the United States Treasury, and Eurogasco's claim and expectation that it would receive additional payments pursuant to the Hungarian Claims Agreement. On December 29, 1977, Eurogasco's Board declared a dividend in the amount of $3,134,250, all of which was paid to the First Preferred stockholder. This was disclosed to the plaintiff and all other stockholders no later

than April 21, 1978, the date of Eurogasco's 1977 Annual Report.

When Eurogasco received additional payments on its Hungarian claims in 1978, 1979, and 1980, the circumstances that prompted the declaration of dividends in 1977 still existed and led the directors to conclude that the payment of dividends remained the most appropriate course to follow. It was the Board's purpose and intention in December 1977, and during the following years, to reduce as quickly as possible existing dividend arrearages on the preferred stock, and then to dissolve the defunct company and pay Eurogasco's remaining assets to its stockholders in the form of liquidation payments upon dissolution. Upon all the facts and circumstances, it seems that the decision to pay dividends to the holder of the First Preferred was fair.

The plaintiff argues, however, that the dividend declarations were unfair both procedurally and substantively. The decisions were procedurally unfair, argues the plaintiff, because, first, neither independent directors were substituted nor outside counsel were consulted, and second, because the voting rights of the Second Preferred stockholders were violated.

As to the first argument, it is true that Eurogasco's directors did not attempt in 1977, or in the subsequent years, to bring in any outside directors on the Board nor to obtain prior judicial approval for the payment of dividends. Although this procedure has been sanctioned in other cases, see, e.g., Weinberger v. UOP, Inc., 457 A.2d 701, 709 n. 7 (Del.1983), the failure to employ such a procedure is not fatal since the decision to declare dividends, as a whole, was fair, Weinberger, supra, 457 A.2d at 711 ("[T]he test for fairness is not a bifurcated one.... All aspects of the issue must be examined as a whole since the question is one of entire fairness."). Likewise, the fact that Eurogasco's directors did not consult outside counsel nor any other person who was not affiliated with Exxon, with respect to the 1977, 1978, and 1979 dividend declarations is not fatal.

With regards to the second procedural argument, the voting rights of the Second Preferred stockholders were not violated. Under Article Fourth of the Certificate of Incorporation, the Board is required to solicit and receive approval of two-thirds of the Second Preferred before deciding to dissolve, liquidate, or wind down Eurogasco. The Board is not required, however, to seek the approval of the Second Preferred before deciding to declare dividends.

The plaintiff next argues that the decisions were substantively unfair because they denied the Second Preferred stockholders any participation in the proceeds of the common property since the end result of the Board's conduct for the members of the plaintiff class was a denial of any share in the profits generated by Eurogasco's recent fortunes and a total forfeiture of the class's investment in Eurogasco. This result may be unfortunate but, under the circumstances, it does not make the decisions unfair.

It is true that stockholders are owners of the corporation and expect to share in its profits. *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1184 (S.D.N.Y.1981). However, these expectations can be crushed. Stockholders are neither creditors nor money lenders, but rather investors. *Treves v. Menzies*, 37 Del.Ch. 330, 142 A.2d 520, 523 (Del.Ch.1958). As investors, the stockholders bear the risk that the company may not make profits in which they can share. *See Wabash Railway Co. v. Barclay*, 280 U.S. 197, 203, 50 S.Ct. 106, 107, 74 L.Ed. 368 (1930) ("When a man buys stock instead of bonds he takes a greater risk in the business. No one suggests that he has a right to dividends if there are no net earnings."). If the company does make money, the stockholders do have an expectation to share fairly in the corporate fortunes. To share fairly, however, does not mean to share equally if the certificate of incorporation provides that certain stockholders receive preferences over others. It is well established that the rights of preferred stockholders are contract rights which the

board of directors must respect. *Baron, supra*, 337 A.2d at 657. In the case at bar, Eurogasco's Board of Directors respected the preferential rights of the stockholders. Considering the circumstances, the Board justifiably declared dividends with the money it received from the Claims Agreement. Unfortunately, for the Second Preferred stockholders and the Common Stock stockholders, there were substantial arrearages on the First Preferred stock, payment of which depleted the available cash.

The plaintiff contends that instead of paying dividends on the First Preferred in 1977–1980, Eurogasco should have retained and invested that money until such time as the amount in the treasury was sufficient to pay the dividend arrearages attributable to both the First Preferred and Second Preferred. It is true that Eurogasco's Certificate of Incorporation does not require the payment of dividends on preferred shares even when arrearages exist and thus the decision to declare dividends is discretionary. However, for two reasons it would have been unwise and unfair of Eurogasco to refuse to pay Exxon, the First Preferred stockholder, its long overdue dividends, in order to create a fund for the eventual compensation of stockholders with inferior rights.[6]

First, there was substantial uncertainty with regards to future payments under the Claims Agreement and to future interest rates. The plaintiff argues that if the Board had invested the money received under the Claims Agreement or placed the money on deposit with Exxon at the interest rates that Eurogasco was then earning on its Exxon account, such funds would have grown to an amount such that Eurogasco's assets at year-end 1984 would have exceeded the total amount of First Preferred dividend arrearages and liquidation preferences.

However, as the defendants point out, using the interest rate prevailing in 1977, it would have taken until the year 2024 for Eurogasco's funds to accumulate to the point where all arrearages of the First and Second Preferred could be paid. Even had Eurogasco's directors in 1977 been able to peer through the uncertainties of the amount and timing of any future claims payments and predict the future precisely, under the then-prevailing interest rate, Eurogasco would not have had enough money to pay off the arrearages on the Second Preferred until the year 2000. Beyond that, if the directors had also been able to foresee that interest rates in 1978–1983 would reach levels double or triple their level in 1977, they would still have found that the payoff date for the Second Preferred arrearages remained 14 years away, in 1991.

Considering the uncertainties in this situation, it would have been unwise to hold the funds with the expectation of paying off the arrearages on the preferred shares. Although the future proved that such a course might have been profitable, hindsight should not be used now to find that the actions taken were unfair.

■ The second reason for not following the plaintiff's suggestion is that, if Eurogasco's Board of Directors had adopted this course, Exxon would have had strong grounds for challenging the decision.

[C]ourts have the power in proper cases to compel the directors to declare a dividend.... In such a case a court acts only after a demonstration that the corporation's affairs are in a condition justifying the declaration of the dividend as a

---

**6.** The Court also notes a third reason why the plaintiff's suggestion is not a viable one. This reason has to do with the other group of excluded stockholders—the holders of the Common Stock. If Eurogasco was required to retain the funds until it could pay money to the holders of the Second Preferred, why should it not also be required to retain the funds until it could pay dividends to the holders of the Common Stock.

The Second Preferred may have preferences over the Common Stock. These preferences, however, do not guarantee the payment of dividends. In this regard, the Second Preferred stockholders are on the same footing with the Common Stock stockholders.

matter of prudent business management and that the withholding of it is explicable only on the theory of an oppressive or fraudulent abuse of discretion. *Eshleman v. Keenan,* 22 Del.Ch. 82, 194 A. 40, 43 (Del.Ch.1937), *aff'd,* 23 Del.Ch. 234, 2 A.2d 904 (Del.1938). Here, Eurogasco has been defunct for thirty years, with no operations or business other than to collect on its claim. It had never paid any dividends and had by 1977 accumulated nearly $6.5 million in dividend arrearages on the First Preferred. In keeping with prudent business management, the board of directors does have a fiduciary duty to see that preferred dividend arrearages are brought up to date as soon as possible. *Baron, supra,* 337 A.2d at 660. A long drawn out and unjustified freezing of liquid assets by the board of directors would have justified intervention by the court in order to protect the preferred stockholder's equity. *Treves, supra,* 142 A.2d at 523.

If the positions were reversed, *i.e.,* Exxon owned all the Second Preferred shares and the plaintiff class owned the First Preferred shares, and if Eurogasco followed the suggestion of the plaintiff, the plaintiff would probably be in court today arguing that the defendants breached their fiduciary duty by not declaring a dividend. The declaration of dividends on the First Preferred is not unfair just because the First Preferred stock was owned by Exxon. "Granted, the fact that the parent owes a fiduciary duty to its subsidiary, the duty does not require self-sacrifice from the parent." *Getty Oil, supra,* 267 A.2d at 888.

In conclusion, we are satisfied that, in the present circumstances, Exxon has carried its burden to show the intrinsic fairness of the dividend declarations.

**B. The Deposit of Money with Exxon**

■ During the period of 1977–1980, Eurogasco deposited cash with Exxon in an intercompany account. The plaintiff contends that these "upstream loans" were made at interest rates below those which Eurogasco could have obtained if the funds were invested in other short-term invest-

ments or loaned at arm's length to unrelated parties. The defendants contend that the decision to deposit funds with Exxon was reasonable and that the interest payments were fair. The Court agrees with the defendants. Therefore, there was no breach of fiduciary duty.

Safety and liquidity were important features of Exxon's intercompany account. Eurogasco faced uncertainty about interest rate trends; it had to pay taxes on its claims receipts and to repay its loan indebtedness to Exxon; and its directors did not know how long they would be retaining the funds in the treasury. For these reasons, along with the competitive rate it would receive, Eurogasco deposited its cash with Exxon.

Eurogasco's directors reviewed each interest rate Exxon proposed to pay on Eurogasco's deposit. Dilworth and Stewart, both individuals with financial backgrounds, consulted such outside advisers as they considered appropriate, and advised Gill whether they thought each proposed rate was reasonable. Gill evaluated each proposed rate in light of his fellow directors' advice as well as his own awareness of rates available in the market and concluded in each instance that the rate proposed was fully competitive with rates offered on short-term prime marketable securities, and was fair.

The interest rate Eurogasco received was the same rate offered to other depositors with Exxon. Since 1977, the interest rate Exxon has paid to Eurogasco has fluctuated from 5.75% in September 1977 to 17.5% in the second quarter of 1980.

The return obtained by Eurogasco on its deposit with Exxon was the same or higher than the return Eurogasco could have obtained on other investments of similar safety and liquidity, such as three-month certificates of deposit and three-month Treasury bills. The decision to deposit Eurogasco's funds was reasonable, and the interest payments thereby obtained were fair.

A subsidiary's deposit of funds with its parent corporation does not involve a breach of fiduciary duty if the return ob-

tained by the subsidiary is comparable to the return the subsidiary could have earned in the market from other investments with the same safety and liquidity. In conclusion, the defendants did not breach any fiduciary duty to the plaintiff class as a consequence of Eurogasco's deposit of cash with Exxon.

### C. The Decision To Seek Dissolution

In order to prevent a hollow victory, the plaintiff seeks an injunction enjoining Exxon from dissolving Eurogasco. The questions concerning dissolution, thus, arise in this case only insofar as the plaintiff seeks to remedy the alleged breaches of fiduciary duty with respect to the payment of dividends to and the deposit of money with Exxon. Since the Court has concluded that there have been no breaches of fiduciary duty with respect to these actions, this part of the plaintiff's case is now moot.

CONCLUSION

The Court finds that the actions taken by Eurogasco's Board of Directors with respect to the money received from Eurogasco's war damage and nationalization claims were fair. In conclusion, the defendants did not breach their fiduciary duties and thus, the plaintiff class is not entitled to any recovery.

SO ORDERED.